E-filing

1   VERNON C. GOINS II (#195461)
    TAYLOR, GOINS &STALLWORTH LLP
2   1330 Broadway, Suite 1701
    Oakland, CA 94612
3   Telephone: (510) 893-9465
    Facsimile: (510) 893-4228
4
5   LINDA PEDRAZA and FRANCISCO PEDRAZA,
    individually and as guardians ad litem on behalf of their son
6   MICHAEL PEDRAZA

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

                                            C07-04781
10  LINDA PEDRAZA, et al.,              )   COMPLAINT FOR DAMAGES.
                                        )
11          Plaintiffs,                 )
                                        )
12  vs.                                 )
                                        )
13  ALAMEDA UNIFIED SCHOOL DISTRICT,    )
    AND the CALIFORNIA DEPARTMENT OF    )
14  EDUCATION, THE ALAMEDA COUNTY       )
    BOARD OF EDUCATION, ALAN NISHINO,   )
15  individually and as the Superintendent of the )
    Alameda County School District, ARDELLA )
16  DAILEY, as Superintendent of the Alameda )
    Unified School District, DAVID WAX, )
17  individually and as Special Education Director )
    of the Alameda County School District, )
18  THERESA ANDERBERG, as Special       )
    Education Director of Alameda Unified School )
19  District, CALIFORNIA DEPARTMENT OF  )
    EDUCATION and JACK O'CONNELL as     )
20  State Superintendent of Public Instruction for )
    the State of California.            )
21                                      )
                                        )
22          Defendants.                 )
                                        )
23  _____ )

24

25

                                  1

Plaintiffs LINDA PEDRAZA and FRANCISCO PEDRAZA, individually and as guardian ad litmes on behalf of their son MICHAEL PEDRAZA a minor (collectively, the "Pedrazas" and "Parents"), complain of Defendants and allege as follows:

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this civil action and appeal pursuant to 28 U.S.C.§ 1331 and 1343 in that the claims alleged herein arise under the laws of the United States, including the Individuals with Disabilities Education Act (IDEA), as amended, 20 U.S.C. § § 1400 et. Seq., expressly § 1415(i)(2). Original jurisdiction is also conferred upon this Court to redress the deprivation of these Plaintiffs' rights privileges and immunities secured by federal statutes and the United States Constitution, pursuant to 42 U.S.C. § 1983; and to redress discrimination against Plaintiffs based upon disability, pursuant to 29 U.S.C. § 794, commonly known as Section 504 of the Rehabilitation Act (Section 504).

2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine the Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue in this Court is proper under 28 U.S.C. § 1391(b) in that all defendants reside, maintain offices, or enforce implementation of laws relevant to this litigation in this judicial district of California and all the events which are the subject of this complaint occurred within this District.

## DEMAND FOR JURY TRIAL

4. Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure, Rule 38(b).

1

2

**PARTIES**

3    5.  Plaintiff MICHAEL PEDRAZA (Student) is a minor, born on October 25, 1999,

4    identified as an individual with disability within the meaning of 20 U.S.C. § 1401(3) and is an

5    individual with exceptional needs within the meaning of California Education Code § 56026.  He

6    is entitled to receive and has received special education and related services as a resident of

7    Alameda County in the city of Alameda, California and at all times resided in the Alameda

8    Unified School District service area.  The Student is a person who has a physical or mental

9    impairment that substantially limits one or more major life activities within the meaning of 34

10    Code of Federal Regulations § 104.3(i) and therefore, is a student entitled to be free from

11    discrimination based upon his disability pursuant to Section 504.

12    6.  Plaintiff, LINDA PEDRAZA (Mother) is the parent and guardian ad litem of the

13    Student, and at all times was and continues to reside in Alameda County, City of Alameda,

14    California.

15    7.  Plaintiff, FRANCISCO PEDRAZA (Father) is the parent and guardian ad litem of the

16    Student, and at all times was and continues to reside in Alameda County, City of Alameda,

17    California.

18    8.  Defendant ALAMEDA COUNTY BOARD OF EDUCATION (AUSD Board) is and

19    was, at all relevant times, the duly constituted and acting governing board of the Alameda

20    Unified School District and is responsible for education, in compliance with federal and state

21    law, of students attending school, receiving and/or entitled to receive a public education within

22    the AUSD service area.

23    9.  Defendant, ALAMEDA UNIFIED SCHOOL DISTRICT (AUSD), is a public school

24    district and local educational agency duly organized and existing under California law and is

25    located within Alameda County.  At all relevant times, the AUSD was responsible for providing

3

1 | the Student, specifically, and school children within its services area generally, with full and
2 | equal access to public education and activities it offers in compliance with federal and state law
3 | and for providing the Student with a free and appropriate public education (FAPE) in conformity
4 | with the IDEA and corresponding California Education Code requirements. The AUSD receives
5 | federal funding and financial assistance, including, but not limited to, funding under the IDEA.

6 |      10.    The AUSD Board and the AUSD collectively are referred to herein as the "Local
7 | Defendants."

8 |      11.    Defendant ALAN NISHINO is and was, at relevant times mentioned,
9 | Superintendent of the AUSD. He was appointed by the AUSD Board to implement policies
10 | established by the AUSD Board and/or mandated by federal and state law. He is responsible for
11 | ensuring that the AUSE complies with all administrative orders issued by the California
12 | Department of Education in connection with a request for an administrative hearing pursuant to
13 | the IDEA and corresponding California law. AUSD's superintendent is responsible for
14 | supervising Defendants David Wax and Theresa Anderberg, who were directors of special
15 | education for AUSD consecutively. He is named as a defendant in his individual and official
16 | capacity and, based upon information and belief, is a resident of Alameda County, California.

17 |      12.    Defendant ARDELLA DAILEY is and was, at relevant times mentioned,
18 | Superintendent of the AUSD. She was appointed by the AUSD Board to implement policies
19 | established by the AUSD Board and/or mandated by federal and state law. She is responsible for
20 | ensuring that the AUSD complies with all administrative orders issued by the California
21 | Department of Education in connection with a request for and administrative hearing pursuant to
22 | the IDEA and corresponding California law. She is named as a defendant in her individual and
23 | official capacity and, based upon information and belief, is a resident of Alameda County,
24 | California.

25

4

13.    Defendant DAVID WAX (Former Director), was Director of Special Education for the AUSD at all times relevant to claims against him up to and including January 2005. As Director of Special Education for AUSD, his duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, were provided with a FAPE. As Director of Special Education, he also was responsible for ensuring that AUSD complied with all administrative orders issued by the California Department of Education regarding AUSD in connection with a request for an administrative hearing pursuant to the IDEA and corresponding California law. He is named herein as a defendant in his individual and official capacity and, based upon information and belief, is a resident of Alameda County, California.

14.    Defendant ROLASIND DAVENPORT (SPED Director), is and was, Director of Special Education for AUSD at all times relevant to claims against her, commencing in or about January 2005. As Director of Special Education for AUSD, her duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, are provided with a FAPE, SPED Director Davenport also is and was responsible for ensuring that AUSD complied with all administrative orders issued by the California Department of Education regarding AUSD. She is named herein as a defendant in her individual and official capacity and, based upon information and belief, is a resident of Alameda County, California.

15.    Defendant THERESA ANDERBERG (Former SPED Director), is and was, Director of Special Education for AUSD at all times relevant to claims against her, commencing in or about January 2005. As Director of Special Education for AUSD, her duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, are provided with a FAPE, SPED Director Anderberg also is and was responsible for ensuring that AUSD complied with all

1    administrative orders issued by the California Department of Education regarding AUSD. She is

2    named herein as a defendant in her individual and official capacity and, based upon information

3    and belief, is a resident of Alameda County, California.

4         16.    Superintendent ALAN NISHINO, Superintendent ARDELLA DAILEY, Former

5    Director DAVID WAX, Special Education Director ROSLAIND DAVENPORT and Former

6    Special Education Director THERESA ANDERBERG are referred to herein collectively as "the

7    Individual Defendants."

8         17.    Defendant, CALIFORNIA DEPARTMENT OF EDUCATION (CDE), is the

9    State governmental entity mandated and established to oversee the operation of public schools

10   and delivery of public education entitlements in the State of California. CDE is responsible for

11   ensuring that all children in California receive public education services pursuant to federal and

12   state law, and to ensure that all children with disabilities and exceptional needs in California

13   receive a FAPE pursuant to the IDEA and California law, and to ensure that local educational

14   agencies, including AUSD, comply with the provisions of the California Education Code and the

15   IDEA.

16        18.    Defendant JACK O'CONNELL (Superintendent O'Connell) is State

17   Superintendent of Public Instruction for California. Superintendent O'Connell's duties include

18   overseeing the operations of California public schools, executing State policies implementing

19   federal and state law regarding the provision of public education to all children with disabilities

20   and exceptional needs in California; monitoring compliance of public schools and local

21   educational agencies with federal and State law and ensuring that violations of federal and/or

22   State law by state and/or local educational agencies are promptly investigated and corrected. In

23   California the State Superintendent of Public Instruction exclusively is authorized to bring an

24   action to enforce an order issued pursuant to California's Complaint Resolution Procedures

25

6

1    (CPR).  Superintendent O'Connell is named as a defendant herein in his official capacity.  CDE

2    and Superintendent O'Connell are referred to collectively herein as "State Defendants."

3        19.    Plaintiffs are informed and believe and therefore allege that each of the

4    defendants named herein is responsible for the pattern and practice of events alleged, or is a

5    necessary party for obtaining appropriate relief.  In performing each of the acts alleged, and in

6    their failure to fulfill their legal responsibilities set forth herein, each defendant acted jointly or

7    individually for each other and for all other defendants.  The injuries suffered by plaintiffs, and

8    each of the, occurred because of the actions and omissions of the named defendants.

9                                    **FACTUAL ALLEGATIONS**

10       20.    The Student is eligible for special education and related services due to autism.

11   On or about June 4, 2004, the Student's Parents participated in the individual educational plan

12   (IEP) team meeting with staff members of the AUSD.  At this time, the District offered services

13   to the Student for the 2004-2005, 2005-2006 and 2006-2007 school year in an IEP and the

14   Parents agreed and signed IEP.  Shortly thereafter, this IEP was amended pursuant to a January

15   25, 2005 addendum.  The IEP and January 2005 addendum outlined certain behavioral services,

16   behavioral program supervision, occupational therapy services, speech and language services to

17   be provided at the expense of the District including but not limited to:   a full time one-to-one

18   adult aide; speech and language services for 60 minutes three times a week; individual

19   occupational therapy for 60 minutes two times per week; 540 minutes a week of behavioral

20   services at home; 60 minutes a week of behavioral supervision at home or school.

21       21.    According to the IEP, the District promised to assess the Student in a timely

22   appropriate and accurate manner.  Despite several assessments, the District failed to, among

23   other things:  propose goals and objectives; provide recommendations for frequency and duration

24   of services;  failed accurately reflect Student's cognitive or intellectual functioning.

25

                                              7

1    22.    On or about January 5, 2006, Parents and AUSD met to discuss the

2  aforementioned issues and concerns regarding the assessments. At the conclusion of this

3  meeting, AUSD agreed to pay for an Independent Educational Assessment ("IEE") and

4  reimburse Parents for any costs or expenses associated therewith.

5    23. On or about January 19, 2006, Parents provided AUSD with the identification and

6  curriculum vitae of an individual qualified, designated and selected by Parents to conduct the

7  IEE named Lowy Apple.  When AUSD did not respond, Parents then wrote to notify AUSD that

8  it would obtain an IEE at AUSD's expense.  Parents also requested a meeting with AUSD to

9  discuss the content of the letter and the steps necessary to complete the IEE.

10    24.    On June 7, 2004, the District offered services to the Student for the 2004-2005,

11  2005-2006 and 2006-2007  school year in an IEP and the Parents agreed and signed IEP. These

12  services also consisted of providing Applied Behavior Analysis ("ABA") services.  Despite

13  AUSD's promise, it failed to ensure the delivery of such services in that:  AUSD knew that ABA

14  services provided by selected agencies, could not be provided in a timely manner;  selected failed

15  to provide services despite the Parents initiation of the process by submitting an initial

16  application; lack of qualified personnel by agencies to provide appropriate and necessary

17  treatment.

18    25.    From 2004 through 2006, the IEP team and the Parents met on numerous

19  occassions to discuss AUSD's provision of occupational therapy services.  Shortly thereafter and

20  based on assessment, it was determined that Student needed services in a clinic setting and in a

21  separate motor room that AUSD did not have.  Despite being notified of the Student's needs,

22  AUSD did not provide such services and has not provided occupational therapy services since

23  2005.

24    26.    Additionally, AUSD has significantly impeded engaged in acts and omissions that

25  have significantly impeding Parents' right to participate in the decision making process relating

8

1   to the Student's education: failing to hold an IEP on a triennial basis; failing to provide

2   assessment reports to Parents before IEP meetings; failing to provide timely notice of

3   termination of services; failing to make an offer of placement to Student in 2006; failing to have

4   a representative of proposed behavioral services present at IEP meetings; precluding Parents

5   from observing placements;

6       27.    In or about June 2006, the Students' mother and father (Parents) initiated due

7   process proceedings on behalf of themselves and the Student pursuant to 20 U.S.C. § 1415 and

8   California Education Code §§ 56500 et seq.  The Parents filed a complaint pursuant to 20 U.S.C.

9   § 1415, with the Office of Administrative Hearings-Special Education Division (OAH-SED) (the

10  current CDE designee to provide administrative review mandated under the IDEA, effective July

11  1, 2005), alleging that the AUSD denied the Student a FAPE during the 2003-2004, 2004-2005,

12  2005-2006 and 2006-2007 school year by failing to provide the Student with the services set

13  forth in the IEP.

14      28.    The Student and his Parents are aggrieved parties, pursuant to 42 U.S.C. § 1415 of

15  the IDEA, regarding a decision and order issued by a hearing officer for the OAH-SED.

16  (Exhibit A hereto). The hearing officer erred as a matter of law when the dismissed the Student's

17  IDEA claims that the AUSD denied the Student a FAPE for the 2003-2004, 2004-2005, 2005-

18  2006, 2006-2007  failing to provide the services and consideration promised.

19      29.    The Student and his Parents further are aggrieved by the hearing officer's order to

20  the extent the decision denies them the right to prove that the AUSD denied the Student a FAPE

21  and to the extent the Student and his Parents would be unable to recover attorney fees as a

22  prevailing party for the AUSD's denial of a FAPE to the Student.

23      30.    The AUSD has knowingly and deliberately manipulated the administrative review

24  process to deny the Student a FAPE as appropriate and necessary

25

9

31.    The AUSD Board and Superintendents Nashino and Dailey have failed to adopt policies, procedures and practices, or take necessary measures to ensure that AUSD provides the Student with the services.

32.    The SPED Directors and Former Director Wax have failed to take appropriate measures to comply with the CDE order and fulfill AUSD's obligations under the IEP.

33.    Based upon information and belief, the defendants and each of them have ignored their obligations to the Student under IDEA because the Student has a disability and his Parents have actively advocated for the Student's rights by seeking redress through the process required under the IDEA.

34.    Superintendents Nashino and Dailey failed to adequately supervise SPED Directors and Former Director Wax and failed to ensure that either took appropriate measures to provide the Student with the services as outlined in the IEP.

35.    The State Defendant failed to monitor the AUSD failure and continuing failure to provide the Student with the services described in the IEP.  The State Defendant has failed to bring any action to enforce the requirements of the IDEA or ensure the AUSD's compliance with the IEP.

36.    The State Defendant has failed to adopt procedures and practices or take necessary measures to ensure that AUSD fulfills obligations under the IDEA to resolve claims of denials of a FAPE. The State Defendant has enabled the AUSD to commit ongoing violations of the due process rights prescribed under the IDEA, including the Student's rights, by denying mandated relief for prospective denials of a FAPE caused by AUSD.

37.    The Student and his Parents have exhausted their administrative remedies by attempting to obtain enforcement of and compliance with the IEP. Further attempts to redress the denials of a FAPE to the Student for the 2003-2004, 2004-2005, 2005-2006 and 2006-2007 school years is excused because to do so would be futile given the Parents failed efforts and will

10

1    accomplish nothing other than further delay the Student and his Parents from obtaining the relief

2    for the AUSD's denial of a FAPE to the Student.

### FIRST CLAIM FOR RELIEF
**(Violation of Individuals with Disabilities Education Act,
20 U.S. Code §§1400 *et seq.* – Against All Defendants)**

5        38.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein,

6    all preceding paragraphs of this Complaint.

7        39.    The purpose of the IDEA is to ensure that all children with disabilities have

8    available to them a free appropriate public education that emphasizes special education and

9    related services designated to meet their unique needs and to ensure that the rights of children

10   with disabilities and parents of such children are protected.

11       40.    The Defendant's acts and missions are alleged herein violated the intent and

12   purpose of the IDEA. The acts of the Individual Defendants, and each of them, as alleged herein,

13   were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

14   Plaintiffs were damaged as a result of said acts and omissions.

15       41.    Plaintiffs seek all available remedies afforded to them for violations of the IDEA,

16   including, but not limited to, compensatory education, reimbursement, injunctive relief and

17   attorney fees and costs.

18       42.    The IDEA includes an express, unequivocal abrogation of immunity under the

19   Eleventh Amendment pursuant to 20 U.S.C. § 1403 which was enacted pursuant Congress'

20   powers under § 5 of the Fourteenth Amendment of the United States Constitution.

21       43.    Plaintiffs exhausted their administrative remedies as alleged herein by: continuing

22   meet and confer efforts with AUSD and its representatives; continuing to attempt to resolve the

23   AUSD's denial of services, compensatory services and reimbursement had not been resolved;

24   filing a complaint, pursuant to 20 U.S.C. § 1415, with the Office of Administrative Hearings-

25   Special Education Division; and exhausting said complaint when the OAH-SED decided the

1  case; Further administrative attempts to redress Defendants' IDEA violations is excused because

2  to do so would be futile and/or offers inadequate relief. Alternatively, further administrative

3  attempts to redress Defendants' IDEA violations is excused because the Defendants have

4  adopted a policy and/or pursued a practice of general applicability that is contrary to the law.

5     44.    The acts and omissions giving rise to the Plaintiff's injuries as alleged herein

6  could have been redressed by the IDEA's administrative procedures and remedies had

7  Defendants, and each of them, complied with the CDE's findings as alleged herein.

8     45.    Plaintiffs' efforts, as alleged herein, gave Defendants, and each of them, full

9  exploration of technical educational issues, and provided Defendants the first opportunity to

10  correct shortcomings in their educational programs for the Student in order to ascertain and

11  alleviate the problems alleged herein to no avail.

12     WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

13  ### SECOND CLAIM FOR RELIEF
(42 U.S.C. Section 1983 -  Violation of Individuals
14  with Disabilities Education Act, 20 U.S. Code §§1400 *et seq.*)

15  **[Count One – Prospective Injunctive Relief  Against Defendant Superintendent O'Connell
and Individual Defendants in Their Official Capacities]**
16

17     46.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein,

18  all preceding paragraphs of this Complaint.

19     47.    The IDEA gives disabled students a substantive right to public education and

20  conditions federal assistance upon a State's compliance with the substantive and procedural

21  goals of the Act. 42 U.S.C. § 1983 is a generally and presumptively available remedy for claimed

22  violations of federal law.

23     48.    Congress added § 1415(f) to the Education of the Handicapped Act ("EHA")

24  (IDEA's predecessor) as part of the Handicapped Children's Protection Act of 1986.  In adding

25  Section 1415(f) to IDEA in 1986, Congress specifically authorized legal actions predicated on

the IDEA.  As amended, 20 U.S.C.A. § 1415 provides that:

12

"(f) Effect on other laws

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [ ], or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

49.     The Individual Defendants and Defendant Superintendent O'Connell acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of the IDEA as alleged herein.

50.     The Individual Defendants' and Defendant Superintendent O'Connell's acts and omissions as alleged herein violated the intent and purpose of the IDEA.  Alternatively, Defendants' acts and omissions as alleged herein violated the Student's constitutional substantive right to public education and/or his property interest found in California's Education Code §§ 56500 et seq.

51.  Plaintiffs were harmed and continue to be harmed as a result of said acts and omissions.  As a direct and proximate result of the acts and omissions alleged in this Complaint, the Student and his Parents will continue to be damaged and suffer irreparable harm unless the Defendants are enjoined.  Plaintiffs seek all available prospective injunctive relief afforded to them for violations of the IDEA.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

### [Count Two – Retrospective and Monetary Relief Against Individual Defendants in Their Individual Capacities]

52.     Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

13

53.     The Individual Defendants acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of the IDEA as alleged herein.

54.     The Individual Defendants' acts and omissions as alleged herein violated the intent and purpose of the IDEA.  The acts of the Individual Defendants, and each of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

55.     Plaintiffs were damaged and continue to be damaged as a result of said acts and omissions.  Plaintiffs seek all available retrospective and monetary relief afforded to them for violations of the IDEA.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## THIRD CLAIM FOR RELIEF

### (Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S. Code §794 – Against All Defendants)

56.     Plaintiffs reallege and incorporate by reference, as though fully set forth herein all preceding paragraphs of this Complaint.

57.     The Student is disabled as defined by Section 504 of the Rehabilitation Act of 1973.  The Student is "otherwise qualified" to participate in school activities in the District.  The District Receives federal financial assistance.

58.     The Defendants' acts and omissions as alleged herein violated Section 504 of the Rehabilitation Act of 1973 by preventing the Student from participating fully in the educational opportunities available in the District and/or was subject to discrimination as a consequence of his disability and/or in retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for the Student's rights.

59.  The Defendants, and each of them, intentionally discriminated against Plaintiffs and/or were deliberately indifferent to Plaintiff's federally protected rights.  The acts of the

14

Individual Defendants, and each of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

60. Plaintiffs were damaged as a result of said acts and omissions. Plaintiffs seek all available remedies afforded to them for violations of Section 504 of the Rehabilitation Act of 1973.

61. Section 504 of the Rehabilitation Acct of 1973 includes an express, unequivocal abrogation of the immunity under the Eleventh Amendment pursuant to 42 U.S.C. § 2000d-7(a)(1) which was enacted pursuant to Congress' powers under § 5 of the Fourteenth Amendment of the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## FOURTH CLAIM FOR RELIEF

**(42 U.S.C. Section 1983 – Section 504 of the Rehabilitation Act of 1973, 29 U.S. Code §794)**

**[Count One – Prospective Injunctive Relief Against Defendant Superintendent O'Connell and individual Defendants in their Official Capacities]**

62. Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

63. Section 504 of the Rehabilitation Act of 1973 prohibits the denial of the benefit of any services, programs, or activities provided by the District on the basis of disability. 42 U.S.C. § 1983 is a generally and presumptively available remedy for claimed violations of federal law.

64. The Student is disabled as defined by Section 504 of the Rehabilitation Act of 1973. The Student is "otherwise qualified" to participate in school activities in the District.

65. The Defendants' acts and omissions as alleged herein violated Section 504 of the Rehabilitation Act of 1973 by preventing the Student from participating fully in the educational opportunities available in the District and/or was subject to discrimination as a consequence of his disability and/or in retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for the Student's right. The Defendants, and each of them,

15

1    intentionally discriminated against Plaintiffs and/or were deliberately indifferent to Plaintiffs'

2    federally protected rights. Plaintiffs were damaged as a result of said acts and omissions.

3    Plaintiffs seek all available remedies afforded to them for violations of Section 504 of the

4    Rehabilitation Act of 1973.

5        66.    The Individual Defendants acted under color of state authority while engaging in

6    the acts and omissions which Plaintiffs contend violate the provisions of Section 504 of the

7    Rehabilitation Act of 1973 as alleged herein.

8        67.    The Individual Defendants' acts and omissions as alleged herein violated the

9    intent and purpose of Section 504 of the Rehabilitation Act of 1973. Alternatively, Defendants'

10    acts and omissions as alleged herein violated the Student's constitutional substantive right to

11    public education and/or his property interest in a public education. The denial of the opportunity

12    to participate fully in the education al opportunities available in the District and/or the

13    discrimination he was subjected to as a consequence of his disability affects the Student's ability

14    to complete his education as well as success in getting into college. Alternatively, the denial of

15    the opportunity to participate fully in the educational opportunities available in the District in

16    retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for

17    the Student's rights violated Plaintiffs' constitutional rights.

18        68.    Plaintiffs were harmed and continue to be harmed as a result of said acts and

19    omissions. Plaintiffs seek all available prospective injunctive relief afforded to them for

20    violations of Section 504 of the Rehabilitation Act of 1973. As a direct and proximate result of

21    the acts and omissions alleged in this Complaint, the Student and his Parents will continue to be

22    damaged and suffer irreparable harm unless the Defendants are enjoined.

23        WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

24

25

16

**[Count Two – Retrospective and Monetary Relief Against**

**Individual Defendants in Their Individual Capacities]**

69.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

70.    The Individual Defendants acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of Section 504 of the Rehabilitation Act of 1973 as alleged herein.

71.    The Individual Defendants' acts and omissions as alleged herein violated the intent and purpose off Section 504 of the Rehabilitation Act of 1973.  The acts of the Individual Defendants, and each of them, as alleged herein,, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.  Plaintiffs seek all available retrospective and monetary relief afforded to them for violations of Section 504 of the Rehabilitation Act of 1973.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

### FIFTH CLAIM FOR RELIEF
**(42 U.S.C. Section 1983 – Violation of the Due Process Clause of the Fourteenth Amendment Against Individual Defendants in Their Individual Capacities)**

72.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

73.    The Fourteenth Amendment forbids the State from depriving any person of life, liberty, or property without due process of law.  The State of California created a property interest in public education for disabled students with exceptional needs to receive certain benefits as set forth in California's Education Code §§ 56500 et seq.

74.    Having chosen to extend the right to an education to people of the Student's class, the State is constrained to recognize a student's legitimate entitlement to the benefits bestowed pursuant to California Education Code §§ 56500 et seq., as a property interest which is protected

17

by the Due Process Clause and which may not be deprived without adherence to the minimum procedures required by that Clause. The deprivations to the Student's of the benefits as alleged herein are not de minimis and constitute a serious event in the life of the Student and effects the Student's ability to complete his education as well as success in getting into college.

75.    The Student was deprived of this property interests as alleged herein without being afforded notice and opportunity for hearing appropriate to the nature of the case, particularly in the decision by the OAH-SED to make a decision against the Plaintiffs concerning the 2003-2007. The Plaintiffs were deprived of the fundamental requisites of due process of law by being denied of the opportunity to be heard and to contest the deprivation of the Student's property interest as alleged herein. The acts of the Individual Defendants, and each of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

///

///

///

18

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.      For special and economic damages according to proof;

2.      For general and non-economic damages according to proof;

3.      For punitive damages against the Individual Defendants in their individual capacities for those claims in which they are available where the conduct is willful, wanton, malicious, and oppressive, according to proof;

4.      For prejudgment interest at the prevailing legal rate;

5.      For injunctive relief as described herein, to wit:

         (a)      That the Plaintiffs be made whole and afforded all benefits attendant thereto that would have been afforded Plaintiffs but for the wrongful conduct alleged herein;

         (b)      That Defendants, their agents, successors, employees, and those acting in concert with them be enjoined permanently from engaging in each of the unlawful practices, policies, usages, and customs set forth herein.

6.      For costs of suit including reasonable attorneys' fees; and

7.      For such other and further relief as the Court may deem proper.

Dated: September 17, 2007        Respectfully submitted,
                                    TAYLOR, GOINS & STALLWORTH LLP


By: _____
                    VERNON C. GOINS  II
                    Attorneys for Plaintiffs
                    LINDA PEDRAZA and FRANCISCO PEDRAZA,
                    individually and as guardians ad litem on behalf of
                    their son MICHAEL PEDRAZA

19

**EXHIBIT A**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matters of:<br><br>STUDENT,<br><br>       Petitioner,<br><br>v.<br><br>ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>       Respondent. | OAH CASE NO. N2006090010 |
| ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>       Petitioner,<br><br>v.<br><br>STUDENT,<br><br>       Respondent. | OAH CASE NO. N2006100365 |
| STUDENT,<br><br>       Petitioner,<br><br>v.<br><br>ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>       Respondent. | OAH CASE NO. N2006100740 |

**DECISION**

Charles Marson, Administrative Law Judge, Office of Administrative Hearings, Special Education Division, State of California, heard this matter on April 2-6 and 17-20, 2007, in Alameda, California.

Petitioner's mother (Mother) represented Petitioner (Student). Mother was present throughout the hearing. Student's father (Father) was briefly present on April 6, 2007, in response to a District subpoena, but did not testify.

Karen E. Samman, Attorney at Law, represented Respondent Alameda Unified School District (District). Tamra J. Kaufman, Attorney at Law, also appeared for the District on April 2-7, 2007. Rosalind Davenport, the District's Director of Special Education, was present throughout the hearing, except on the afternoon of April 20, 2007, when Elizabeth Kowal, Program Specialist, was present for the District.

Student filed his request for due process hearing in Case No. N2006090010 on August 31, 2006. The District filed its request for due process hearing in No. N2006100365 on October 10, 2006. On October 18, 2006, Student moved to consolidate the two matters. On November 1, 2006, OAH consolidated the two matters and granted a continuance to conform the timeline for the two consolidated matters to that of No. N2006100365, the later-filed case.

Student filed his second request for due process hearing in Case No. N2006100740 on October 19, 2006, and moved to consolidate all three matters. On November 22, 2006, OAH consolidated the three matters and granted a continuance to conform the timeline for the three consolidated matters to that of No. N2006100740, the last-filed case.

At hearing, oral and documentary evidence were received. On April 6, 2007, the parties were granted a continuance until April 17, 2007. On April 20, 2007, the parties were granted a continuance for submission of a declaration and briefs. Closing briefs were filed on May 14, 2007, whereupon the matter was submitted.

## ISSUES

1.    Were the District's triennial assessments of Student in September, October, and November 2005 inaccurate?

2.    Should the District have reimbursed Parents for an Independent Educational Assessment (IEE)[1] conducted by Dr. Allison Lowy Apple?

3.    Did the District deny Student a free appropriate public education (FAPE) in the school year (SY) 2004-2005 by failing to provide him behavioral services,[2] occupational therapy

---

[1] An "assessment" in California law is the same as an "evaluation" in federal law. (Ed. Code, § 56303.) The federal abbreviation for independent educational evaluation (IEE) is used herein.

(OT) services, and speech and language (S/L) services in conformity with his June 7, 2004 individualized education program (IEP) and its January 5, 2005 Addendum?

    4.     Did the District deny Student a FAPE in SY 2005-2006 by:

        A.     Failing to provide him behavioral services, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum, or

        B.     Violating the procedural requirements of IDEA by failing to hold an IEP meeting until January 6, 2006; not providing to Parents copies of triennial assessment reports before the January 6, 2006 IEP meeting; failing to provide timely notice of the termination by Consultants for Learning and Autism Support Services (CLASS) of its behavioral services; not making an offer of placement to Student at the January 19, 2006, and February 14, 2006 IEP meetings; not having a representative of the proposed behavioral services provider Stepping Stones present at the February 14, 2006 IEP meeting; or offering at the March 20, 2006 IEP meeting to place Student at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present?

    5.     Did the District deny Student a FAPE in SY 2006-2007 by failing to provide him behavioral services, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum?

    6.     Did the District violate the procedural requirements of IDEA in SY 2006-2007 by refusing to convene an IEP meeting from June 20, 2006, to the present?

    7.     Did the District offer Student a FAPE for SY 2006-2007 by offering to place him in the Special Day Class (SDC) at its Haight Elementary School, and offering related services and supports?

    8.     Is Student entitled to relief by reimbursement of Parents for costs of behavioral, OT, and S/L services; compensatory education in the areas of behavioral, OT, and S/L services; reimbursement of the costs of Dr. Allison Lowy Apple's IEE; or an order requiring the immediate convening of an IEP meeting?[3]

## CONTENTIONS OF THE PARTIES

    Student, who is autistic, contends that the District's triennial assessments of him conducted in September, October, and November 2005 were inaccurate, and seeks

---

[2] Student's requests for due process hearing address behavioral services, behavioral supervision, and behavioral consultation separately. However, at hearing, Student treated them as a single service, and they are so treated here.

[3] Student also requested an order that the District fund assessments by Dr. Marilyn Buzolich in the areas of Assistive Technology and Augmentative and Alternative Communication, and provide Student such technologies as she recommends. However, Student made no mention of this issue at hearing, and it is not addressed further here.

reimbursement for an IEE by Dr. Allison Lowy Apple that Parents allegedly obtained because they disagreed with the District's assessments. The District contends that its assessments were accurate, and that the Lowy Apple IEE was conducted before its assessments, and therefore could not have been sought because of disagreement with those assessments.

Student contends that from the beginning of SY 2004-2005 to the present, the District failed to provide him behavioral services and behavioral program supervision, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum. The District contends that each service was provided at District expense, or could not be provided due to Parents' obstruction and lack of cooperation. The District contends that Parents obstructed its delivery of services by rejecting District-funded providers, unilaterally terminating them, failing to cooperate with them, and attempting to control their qualifications and programs to an extent unacceptable to them.

Student contends that the District significantly impeded Parents' opportunity to participate in the decision-making process by failing to hold timely IEP meetings, timely provide assessment reports, timely notify them of the decision of a behavioral services provider to terminate its services, make a placement offer, secure the attendance of a behavioral specialist at an IEP meeting, or allow timely inspection of the proposed placement. The District responds that it arranged for the triennial IEP meeting as soon as practicable, appropriately provided assessment reports at the first triennial meeting, promptly notified Parents of the service provider's decision to terminate its contract, made an offer of placement at the first triennial IEP meeting and restated it thereafter, did not need a representative of the proposed behavioral services provider at the meeting, and did not delay Parents' inspection of the proposed placement. It argues that there was no reason to hold an IEP meeting after June 2006, as the parties had reached an impasse and Parents only sought to continue restating disagreements already thoroughly aired. Finally, it asserts that none of these alleged procedural shortcomings had any significant effect on Parents' right to participate in the decision-making process, or on Student's education.

The District contends that Student, who is now in a fully inclusive preschool, is too old for preschool and requires a small, highly structured, specialized class taught by experts in autism. The District argues it offered a FAPE to Student for SY 2006-2007 by offering him placement in its Haight Elementary School SDC for autistic children, which integrates behavioral, OT, and S/L services, among others. Student, who is approaching eight years of age, contends that he is prospering in a fully inclusive private preschool otherwise attended by children aged two to five; that the District should continue to fund his placement there; and that the offered SDC placement is inappropriate because it uses the wrong teaching method and is not fully inclusive.

## FACTUAL FINDINGS

*Background*

1.      Student is seven years old and resides with Parents in the District. He is eligible for, and has been receiving, special education and related services because of autistic-like

behaviors. He displays significant speech, language, and sensory processing delays and lacks social skills. His preacademic skills approximate those of a typically developing three year old. He is capable of one to two word utterances, mostly in response to prompts. He scores in the first percentile on cognitive and other tests, and functions within the range of the mentally retarded.

2.     Student's Parents placed him in Son-Light Preschool (Son-Light), a private, church-affiliated full inclusion program in Oakland, when he was two years old. He has attended the school for five years and by parental choice still does, though he is approaching eight years of age and his classmates range from two to five. The District previously reimbursed Parents for Student's tuition and one-to-one aide at Son-Light, but is no longer willing to do so because it believes he is too old for preschool and belongs in an SDC for autistic children.

*The last agreed-upon and implemented IEP*

3.     On June 7, 2004, the parties met to determine Student's program for the upcoming school year. The District and Parents agreed that Student would continue to attend Son-Light for three hours every school day, accompanied by a full-time one-to-one adult aide. The parties agreed to the provision of individual S/L service for 60 minutes three times a week; individual OT for 60 minutes twice a week; 540 minutes a week of behavioral services at home; and 60 minutes a week of behavioral services supervision at home or school. The June 7, 2004 IEP is Student's last agreed-upon and implemented IEP. He received special education and services pursuant to its terms throughout SYs 2004-2005 and 2005-2006.

*The District's Triennial Assessments*

*The psychoeducational assessment by Ilana Novak*

4.     The parties met on August 29, 2005, and agreed upon a plan for assessing Student for his triennial review on January 5, 2006. Pursuant to that plan, Ilana Novak, the District's school psychologist, completed a psychoeducational assessment of Student on October 11, 2005. Novak has worked for the District for 27 years and has assessed between 2000 and 3000 students. She has a master's degree and a credential in school psychology, and is a licensed clinical psychologist. She lectures at California State University at Hayward, where she teaches cognition and the assessment of intelligence to graduate students. She has been a school psychologist for 30 years.

5.     As part of her assessment, Novak observed Student at home and preschool, and interviewed Mother. She administered the DASI-II (Developmental Activities Screening Inventory) and Piagetian Activities to Student, the ABAS (Adaptive Behavior Assessment System)(teacher and parent respondents), the GARS (Gilliam Autism Rating Scale)(parent respondent) and the Vineland-II Adaptive Behavior Scales (parent respondent). She found that Student was functioning at the pre-conceptual thought level on Piaget's developmental scales, and that he had severe delays in all areas of language and in visual-motor integration. The ABAS revealed that Student was in the lowest first percentile among his peers in adaptive skills.

5

The Vineland-II yielded similar results. Novak concluded that Student needs "close monitoring and supervision in all settings and at all times."

6.      Overall, Novak determined, Student's cognitive ability is at the first percentile relative to children his age, and he is equally delayed in language development and adaptive behavior. She reported that he "functions within the mentally retarded range," and will need "intensive" services in a "highly structured and predictable setting." Novak concluded that Student needed a program "specially designed for students with Autism and multiple delays."

7.      Novak's findings were consistent with previous assessments. In October 2002, when Student was three, psychologist Tom Mushaney and a team at the Woodstock Child Development Center estimated that there were 50 percent delays in Student's overall developmental level compared to his chronological age. In October and November 2003, Dr. Carina Grandison, a developmental neurophysiologist, reached similar conclusions.

### The speech/language assessment by Valerie Coleman

8.      The District's S/L pathologist Valerie Coleman, who holds a master's degree in that specialty, completed a S/L assessment of Student on October 12, 2005. Coleman sought Student's participation in testing for two hours, but he would not sit still for more than ten seconds, attend to any picture stimuli, or engage in any activities with her. She then assessed him by observation and review of caregivers' reports, which, she stated, are valid indicators of S/L abilities. In the area of receptive language, Coleman found that Student could follow simple one step directions such as "wash hands" and "put on shoes," could recognize color words, his name, and all the letters of the alphabet, and could point to a named object or picture when told to "show me." However, he did not respond to greetings or requests from strangers, give appropriate eye contact, initiate conversation, or respond to other children's play requests. In the area of expressive language, he could label animals, colors, numbers, and letters in response to verbal prompts; hum to his favorite book; vocalize, laugh, and squeal to show pleasure; and yell, grunt, or scream to show displeasure. He rarely initiated spontaneous language, used only one or two word utterances, and had a spoken vocabulary limited to common everyday items or names he has been taught. He made his desires known by gestures, or by tugging on an adult. Coleman recommended continued S/L therapy using "a more structured communication system such as the Picture Exchange Communication System (PECS)."

### The occupational therapy assessment by Judith Auston

9.      The District's occupational therapist Judith Auston completed an OT assessment of Student on November 3, 2005. Auston has a master's degree in OT and is a licensed occupational therapist who had worked for the District for seven years. Before that she worked for another district for nine years. She has more than 25 years' experience delivering OT services to children in schools, including many autistic children. She was on Student's original assessment team when he was two years old. In her 2005 triennial assessment, she attempted to use standardized testing, but Student would not maintain eye contact or give her his attention, so she relied on observing him in the individual tutoring room of his preschool. She found significant sensory processing delay. His fine motor skills appeared to be within functional

range. In the area of gross motor skills he was very active, and demonstrated a sensory seeking need for proprioceptive, vestibular, and oral motor input. He had a chew toy on a string around his neck, which he used consistently during seated activities and which gave him focus. Auston testified that Student had needs in both fine and gross motor areas, and that his sensory needs were most evident because he became very agitated if they were not met. Auston recommended OT two times a week for 30 minutes a session.

### The assistive technology assessment by Lois Sonneman

10.    Lois Sonneman, a District S/L pathologist, conducted an assistive technology (AT) assessment of Student on October 24, 2005. Sonneman has been a S/L pathologist for the District for 15 years since receiving her master's degree. She also has a credential and a master's degree in teaching the deaf and blind, and has taught them at the California School for the Blind and the San Francisco Unified School District. Ten years ago, Sonneman became involved in augmentative communication for preschoolers (of which AT is an important part) and acquired a mentor in AT. Since then she has attended many courses and workshops in AT, and completed numerous AT assessments.

11.    Mother requested the AT evaluation because she wanted Student to read better on the computer, and had noticed he had trouble using the computer mouse. Sonneman observed Student using the computer at preschool. She found that he could press the keys that spelled the letters of his name if given color-coordinated cards with the letters in order, but that he frequently held a key down too long. She recommended use of an alternative keyboard that records a single stroke even if a key is held down. She saw that Student did not make reference to the computer monitor or react to its display, and recommended Intellitalk 3, a talking word processing program that speaks letters and words as they are typed. She observed that while Student could click a mouse, he could not drag or color objects, and she recommended daily practice with a simple coloring exercise, and use of a printer to visually display the completed product. She saw that Student could interact with two compact disk (CD) programs for toddlers, and recommended that he be given Living Books CDs to help him read on the screen.

### The preacademic skills assessment by Valerie Abad

12.    Valerie Abad, a District resource specialist, assessed Student's preacademic skills. She reported on October 12, 2005, that his preacademic skills were significantly delayed, greatly affecting the development of language-based concepts critical to academic readiness. He had some rote skills such as counting, but did not understand what numbers correspond to. He could name some letters but did not know the alphabet. He could not write any letter in his name, though he could trace dots for the vertical lines forming his name. Abad concluded that Student "would benefit from a small supportive environment focused on language and social development."

7

*Student's criticisms of the District's assessments*

13.    Student makes no specific criticism of any of the District's assessments, or of the qualifications of its assessors, and no evidence showed that any of the assessments failed to comply with the requirements of law. (See Legal Conclusions 9-10.)

14.    Student makes the conclusory allegation that the assessments did not accurately reflect his "intellectual functioning," but produced no proof to support that allegation.

15.    Student argues that the assessments did not state how he "needed to be worked with in the future." The law does not require that they do so. (See Legal Conclusions 9-10.)

16.    Student argues that the assessments failed to provide recommendations for the frequency and duration of services, but those are requirements of an IEP, not an assessment. (See Legal Conclusion 25.)

17.    Student did not prove that the District's assessments were inaccurate.[4] It is unnecessary to decide affirmatively that the assessments were appropriate, because the District, in No. 2006100365, did not seek that relief. (See Legal Conclusion 35.)

*Independent Educational Assessment (IEE)*

18.    At Student's triennial IEP meeting on January 5, 2006, each of the assessors presented her findings. Parents did not welcome the findings. They disagreed strenuously with school psychologist Novak's finding that Student was, in comparison to typically developing peers, at the first percentile in cognitive ability, and "functions within the mentally retarded range." Parents did not specifically challenge other portions of the assessments, but announced that they disagreed with all the assessments and wanted an IEE. The District agreed to pay for one.

19.    The IEE, for which Parents seek $3,880.48 in compensation, was conducted by Dr. Allison Lowy Apple, a behaviorist in the State of Washington. Lowy Apple attended the triennial IEP meeting on January 5, 2006, by telephone. She was introduced by Mother not in her professional capacity, but as a friend who was helping the family. Mother testified that Parents did not retain Lowy Apple for the IEE until after January 23, 2006. Mother conceded that Lowy Apple knew Student, and had talked to Parents about "what [Student's] needs were" before the IEE was requested, but testified that the actual IEE was not "conducted and completed" until March 2006. That testimony was not credible for the reasons that follow.

20.    Lowy Apple's assessment was conducted and completed before Parents knew anything about the District's assessments. Only the cover page of Lowy Apple's assessment was

---

[4] Student's contention that the proposed goals and objectives are inappropriate rests entirely on the assertion that they are based on inaccurate assessments. Because the assessments are not inaccurate, that contention also fails.

8

introduced in evidence.[5] The date on the cover page is "March 2006," but the descriptions of observations and assessments show that Lowy Apple's work was conducted almost entirely in August 2005, before the District's assessments had even been planned. On August 11, 2005, Lowy Apple saw a video prepared by Mother of Student in his home and school settings. Also on August 15, Lowy Apple observed Student in his preschool setting, at home, and in the community, and administered the Vineland Adaptive Behavior Scales and the Social Skills Rating System. At various times in September, October, and November, Lowy Apple watched other videos prepared by Mother. No later activity is mentioned. Under the caption "Activity," the document is described as "Independent Evaluation," and under the caption "Reason for Referral," the document states that Mother "requested an independent evaluation."

21.    Mother's conduct was inconsistent with her claim that she did not request the IEE until after seeing the District's assessments. At the January 5, 2006 IEP meeting, the District offered a different placement for Student for SY 2006-2007 (see below). Parents refused to discuss that placement, or the goals drafted in conjunction with it, until they received an IEE. Theresa Anderberg, then the District's Director of Special Education, encouraged Mother to provide the credentials of anyone she wished to have considered as an independent assessor. A continuation of the meeting was scheduled for January 19.

22.    Mother testified that at the January 19, 2006 meeting she gave Lowy Apple's curriculum vitae to Anderberg, and proposed Lowy Apple as the independent assessor. Anderberg testified that Mother gave her Lowy Apple's curriculum vitae, but did not request that she be considered as a possible independent assessor, nor did she ever propose any specific assessor. Mother's subsequent conduct confirmed Anderberg's testimony. On January 23, three business days after allegedly proposing Lowy Apple as an assessor, Mother wrote to the District announcing that Parents intended to obtain an IEE at public expense and would submit bills for it. She requested that the IEP team reconvene on February 14 "to discuss the independent examiner's findings and program recommendations for [Student]." That schedule did not allow the District sufficient time to assess Lowy Apple's credentials, nor would it have allowed Lowy Apple sufficient time to conduct an assessment and produce a report. Instead, it suggested that the report already existed.

23.    At the February 14, 2006 IEP meeting, Parents did not mention having an IEE. They asked again for an IEE, but did not mention Lowy Apple, even when the District offered to employ Dr. Bryna Siegel of the Autism Clinic at the Medical Center of the University of California at San Francisco (UCSF) to do the IEE. Parents stated that they would consider the District's offer to employ Siegel, and continued to insist that the proposed placement and related goals could not be discussed until an IEE was obtained. Another IEP meeting was scheduled for March 30.

24.    Mother testified that when she got no response from the District to her request that Lowy Apple be designated the independent assessor, she employed Lowy Apple independently. She did not so inform the District. On March 17, 2006, the District wrote to

---

[5] Although Student was granted leave to allow Lowy Apple to testify by telephone from Washington, she was not called as a witness.

9

Parents, restating its offer to employ Siegel, and pointing out that Parents had not stated why they disagreed with the District's assessments. Parents did not immediately respond.

25.    The IEP team reconvened on March 30, 2006. Again Mother did not mention Lowy Apple or her assessment. According to Anderberg, Mother told the IEP team that the family was still considering the District's offer of assessment at UCSF.[6] She stated that she did not show Lowy Apple's report to the District at the March 30 meeting because it was not yet "fully completed." This contradicted both her earlier testimony and the date on the cover page of the assessment.[7]

26.    On May 21, 2006, the District wrote to Parents proposing two other possible assessors: Dr. Melanie Johnson of Novato, or Dr. Nancy Sullivan of the Children's Health Council in Palo Alto. Parents did not immediately respond, or mention Lowy Apple.

27.    On July 20, 2006, Mother wrote to the District acknowledging the District's May offer of another assessor, but commented that the offer came months after Parents' request for an IEE, and reminded the District of the announcement in her January 23, 2006 letter that Parents would be seeking an outside assessor. Again she made no mention of Lowy Apple, or of the existence of her report. The District remained unaware of Lowy Apple's report until it was disclosed in Student's evidence binder five business days before the hearing.

28.    At all relevant times, Mother was a prolific and articulate correspondent who did not hesitate to write letters and emails to the District whenever she perceived shortcomings in its behavior. However, there is no letter or email in the record showing that Mother ever mentioned her alleged request that Lowy Apple be designated the independent assessor. It is not plausible that she would have failed to communicate to the District her dissatisfaction that the District had not responded to her request concerning Lowy Apple, if she had actually made it in January, nor is it plausible that Mother would have entertained the District's suggestions of other potential assessors without mentioning her pending request.

29.    The weight of evidence showed that Mother never requested that the District accept Lowy Apple as an independent assessor, never proposed any other independent assessor, and never accepted any assessor proposed by the District. By not naming Lowy Apple, Mother discouraged direct contact between Lowy Apple and the District, which would have revealed that the assessment was already completed. By failing to cooperate in selecting another assessor, Mother ensured that the District would not pay for an assessment by anyone else.

30.    The weight of evidence showed that Lowy Apple's assessment was conducted before the District's assessments, and therefore could not have been requested or conducted due

---

[6] Mother denied making that statement, but the notes attached to the IEP mention the statement, and Mother did not challenge those notes when she received them shortly after the meeting.

[7] Mother testified that the IEE was not completed until she had the opportunity in June to inspect the District's proposed placement of Student in the Haight Elementary School SDC (see below). However, there was no connection between the completion of the Lowy Apple assessment and Mother's visit to the Haight SDC. Mother visited the SDC; Lowy Apple did not. Moreover, an IEE assesses a child's needs, not a proposed placement due

to any disagreement with the District's assessments. Parents are therefore not entitled to reimbursement for the Lowy Apple IEE.

### FAPE in SY 2004-2005

31.    A district must deliver special education and services to a student in conformity with his IEP. Student contends that, during SY 2004-2005, the District failed to provide him behavioral, OT, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum.

#### Behavioral Services in SY 2004-2005

##### LIFE

32.    The parties agree that Student needs Applied Behavior Analysis (ABA) services, but have had difficulties finding a provider of ABA services acceptable to Parents. At the beginning of SY 2003-2004, Student was served by the Center for Autism and Related Disorders (CARD), but their services were ended due to disagreements with Mother. The District next offered services by the Foundation for Autistic Childhood Education and Support (FACES), but Parents did not complete that agency's intake process. The District offered services by the Behavioral Intervention Association (BIA), but Parents did not complete its intake process either. At an IEP meeting on March 17, 2004, the District offered services by the Lovaas Institute for Early Intervention (LIFE), but Mother stated that she preferred Behavior Analysts, Inc. (BAI). The District agreed to employ BAI, and prepared a contract for services from that agency. Mother executed a consent form for the sharing of confidential information between the District and BAI, but soon revoked it. BAI refused to proceed without parental consent for the release of information. The extent of actual delivery of behavioral services to Student during that school year is not clear from the record.

33.    At the June 7, 2004 IEP meeting, the District again offered the services of LIFE. Scott Cross, LIFE's clinical director, attended the meeting by telephone. Mother accepted the services of LIFE in writing. The District gave Mother LIFE's standard Information Packet, a lengthy document describing the agency's practices and expectations. Mother signed a form consenting to the District's release of confidential information to LIFE, and the District began to gather information for that purpose. LIFE requested certain information from the District, and Mother agreed to provide other information directly to LIFE.

34.    However, LIFE never provided direct therapy services to Student because Parents declined to complete its intake process. Cross, a board certified behavior analyst experienced in providing ABA services through LIFE and other agencies, described LIFE's intake process at hearing. Like similar agencies, LIFE relies on parents more than school districts to furnish information, even when a district is paying for its services, because parents know their child's complete history, will be involved in treatment, and care most about a favorable outcome. LIFE requires that parents complete an application form and supply a medical evaluation and numerous other documents. It also requires completion by parents of an extensive intake form,

which asks numerous questions about Student's parents and family, his developmental history, his known history of treatment, and possible arrangements for parental participation in treatment. Then LIFE schedules an extensive intake interview with parents, and an observation of the child. Finally, the agency requires that parents sign a contract. LIFE has never accepted a child as a client without the completion of these intake procedures.

35.    On June 10, 2004, Mother wrote to Cross, enclosing "a packet of information for your perusal." Mother then asked Cross fifteen questions about LIFE's services, so that Parents could "determine if your agency will be a good match for our son's needs." On June 28, Cross responded, answering the questions in detail. Some of Cross's answers did not fulfill Mother's expectations. For example, Mother had asked whether LIFE would accept the recommendations and assessment of a previous consultant. Cross responded that while his agency would collaborate with any sound advice, it could not state that its recommendations would always coincide with another agency. And in response to Mother's request for three family references, Scott stated that references were not typically sought from families in order to preserve confidentiality and avoid the perception of pressuring clients.

36.    At some time in June 2004, LIFE sent its intake form to Parents, and encouraged them to contact its regional intake coordinator, Meghan Brearley, to advance the intake process. Mother responded on June 30 by requesting that Cross explain the purpose of the intake form. Cross replied on June 30 that the form was "the first step in the intake process that all of our families participate in," and that the form "allows us the opportunity to ask questions related to development in a variety of domains as well as assess family concerns."

37.    The exchange of emails on June 30 was the last documented contact between Parents and LIFE. Meghan Brearley told Cross that she never heard from Mother. The record does not show any further contact between Parents and the District, or between Parents and LIFE, concerning LIFE's services, nor does it show that Student received any behavioral services funded by the District between June and the beginning of SY 2004-2005.[8]

38.    SY 2004-2005 began in late August 2004. The record does not reveal whether Student was receiving behavioral services privately when the school year began. The District's offer of behavioral services by LIFE remained outstanding and accepted by Parents, but not implemented because Parents had not completed the intake process.

39.    There was no evidence that either Parents or LIFE advised the District before late November 2004 that the intake process remained uncompleted. Somehow the District learned of that fact, and attempted to arrange an IEP meeting in order to "offer" LIFE's services again. On November 22, the District invited Cross to the meeting. Cross agreed to attend, but advised the District that LIFE had no completed application from Parents. The IEP meeting was held on December 1, and Cross attended by telephone, but at that meeting Parents announced that they had hired a different provider, and LIFE was not discussed further. Services by the other provider began on December 6 (see below).

---

[8] Student's claim (in Case No. 2006090010) that the District denied him FAPE by failing to deliver promised services begins with SY 2004-2005, not earlier.

40.     Student makes three arguments to support his claim that LIFE's failure to deliver services from the beginning of SY 2004-2005 through December 5, 2004, was caused by the District. None is persuasive. First, Student claims that the "packet of information" requested of Mother on June 7, 2004, and sent by her to Cross on June 10, satisfied LIFE's need for an intake form. However, nothing in the record describes the packet of information. Cross acknowledged receipt of "the information packet" on June 17, but the June 30 exchange of emails between Mother and Cross shows that, on that day, Mother had the intake form, had not completed it, and asked Cross to explain why she had to fill it out and return it. Thus it is clear that the "packet of information" Mother sent on June 10 was not the intake form the agency required.

41.     Second, Mother testified at hearing that she would produce documentary evidence that she had been in contact with LIFE's regional intake coordinator Meghan Brearley. The only evidence produced shows that Mother sent a copy to Brearley of her June 30, 2004 email to Cross asking the purpose of the intake form. Student produced no evidence that any direct contact between Parents and Brearley occurred.

42.     Third, Student argues that the District failed to provide behavioral services because LIFE was not ready to begin service on June 7, 2004, and could not begin service until August first. Even if true, the argument would not support a claim that services were not provided after August first, or justify Parents' refusal to complete the agency's intake process. However, SY 2004-2005, the first school year at issue here, had not started by August first. Cross did state in a June email that "we envision" having clinical services available around August first, but the services offered by the District were of a different kind and were available immediately. As Cross explained at the June 7, 2004 IEP meeting, LIFE offers two kinds of service. In its "workshop model," families recruit individuals who do one-to-one therapy. They are trained and monitored by LIFE. In its "clinic-based model," LIFE provides the staff. Cross testified without contradiction that his agency could have delivered workshop model services on June 7.

43.     Mother testified that the District's offer at the June 7, 2004 IEP meeting was only for the clinical model, which could not have been provided until August. The District contends that the offer was only for the immediately available workshop model, and the weight of evidence supports its claim. The IEP itself was ambiguous; it offered LIFE for "behavior services." The IEP notes show that both models were discussed, and that the discussion focused more on the workshop model, since Mother was reported as saying she had staff already working with Student who needed training. On June 18, Jacqueline Cheong, Ph.D., the District's program specialist in SY 2004-2005, wrote to Parents stating that "LIFE's workshop model seems to be ideal for your particular needs" and that "the District is therefore ready, willing and able to facilitate the process so that the LIFE workshop model is up and running." There is no evidence that Parents claimed at the time that this was a misunderstanding. Cross's email stating "we envision" the availability of clinic-based services by August is not inconsistent with the District's offer of the workshop model. Cross explained he used that language because many of the agency's families started with the workshop model, and then made the transition to the clinic-based model.