44.    In any event, it was the District, not Cross, that defined its offer. The evidence showed that the District's offer was for the workshop model of services. That service model was immediately available. And it was Parents' failure to complete the intake process, not any staffing shortage at LIFE, that prevented the delivery of services in either model. Finally, no alleged service denial prior to the beginning of SY 2004-2005 in late August is at issue here.

45.    From the beginning of SY 2004-2005 in late August 2004, through December 5, any gap in behavioral services the District was obliged to provide under the June 7, 2004 IEP was caused exclusively by Parents' refusal to complete the intake process for LIFE. It was not caused by any act or omission of the District.

### CLASS

46.    The IEP team met on December 1, 2004, at Parents' request. Mother proposed that the District employ Consultants for Learning and Autism Support Services (CLASS) for behavioral services. Mother stated that Parents would hire CLASS to begin services on December 6 whether the District approved or not, and would hold the District responsible for the cost. The District was unfamiliar with CLASS, but investigated the agency and found it suitable. On December 6, the District wrote to Parents promising to contract with CLASS, which apparently began serving Student that day.

47.    The IEP team met again on January 5, 2005. A CLASS representative attended, and the team agreed upon a behavioral program for Student beginning that day. The IEP Addendum stated that CLASS would provide Student 25 hours a week of services in the home, 15 hours of support a week by a one-to-one aide at school, eight hours a month of supervision in the home, and four hours a week of consultation at school.

48.    Starting on December 6, 2004, and for the remainder of SY 2004-2005, CLASS provided to Student the behavioral services required by the June 7, 2004 IEP and its January 5, 2005 Addendum.

### Occupational therapy services in SY 2004-2005

49.    In California, a school district may finance outside special education services in one of two ways. If a service provider is a nonpublic agency (NPA) certified by the State, the district may contract directly with it. If it is not, the District may not contract directly with it, and can only reimburse parents for expenses incurred. (See Legal Conclusions 17-18.)

50.    In SY 2003-2004, Student received OT services from SUMA KIDS until Mother unilaterally terminated those services without informing the District. In April 2004, Mother retained the services of Rita Montez, an occupational therapist and independent contractor working for Mary Kowar & Associates (Kowar) of El Cerrito. Mother then proposed, at the June 7, 2004 IEP meeting, that the District provide OT services through Kowar, to be delivered by Kowar's independent contractor Montez. The District agreed, and offered to enter into a contract with Kowar so that it could pay Kowar directly.

51.    The District made several efforts to contract with Kowar. Cheong called Montez repeatedly, and once visited her, to propose a contract between the District and Kowar. However, Montez declined, on her own behalf and Kowar's, to enter into a contract. Montez testified that she herself was not an NPA, and did not work independently; she worked only as a contractor for Kowar and similar agencies. Montez also testified that Kowar's El Cerrito facility was not an NPA.

52.    Mother testified that Kowar was and is an NPA. She gave no explanation for her opinion, cited no source for it, and produced no evidence to support it. She admitted she was not familiar with that area of law. Montez's testimony was more persuasive than Mother's because Montez is a professional not involved in the current dispute, and is in a better position to know. Montez testified that she has worked as a contractor for Kowar for several years, and also for several other agencies, some of them NPAs and some not. As a result, she knew the difference, and she was confident Kowar in El Cerrito was not an NPA. A different kind of Kowar facility in San Diego had at some time been an NPA, but had been closed. The weight of evidence was that Kowar was not an NPA.

53.    Montez also testified that Kowar would not contract with the District because, as a separate matter of policy, the agency always insisted on receiving payment directly from parents. This would have prevented the District from contracting with Kowar whether it was an NPA or not.

54.    Having failed to contract with Kowar, the District repeatedly informed Parents, orally and in writing, that it could not obtain such a contract and would have to reimburse Parents if they wanted to use Kowar's services. The District also informed Parents that, if advancing payment to Kowar was too burdensome, as Parents kept claiming, there were two alternatives. The District could seek out a suitable NPA with which it could contract, and could therefore pay directly; or it could provide OT services in-house, from its own occupational therapist. Parents rejected these alternatives, continued to insist on using Kowar, continued to protest the requirement that they advance payments to Kowar and seek reimbursement, and continued to complain that the District would not contract with Kowar.

55.    From the beginning of SY 2004-2005 until April, 2005, Montez, working for Kowar, provided OT services to Student at Kowar's El Cerrito facility. Kowar billed Parents for the services, Parents paid Kowar, and Parents were fully reimbursed by the District, although at a slower pace than they desired. In April 2005, Mother unilaterally terminated Montez's services, stating that Parents could no longer afford to advance Kowar's fees. From April 2005, to the end of SY 2004-2005, Student received no District-funded OT services.

56.    Because Parents rejected the District's proposal that it search for an NPA with which it could contract to deliver OT services, the District did not pursue that alternative. However, the in-house alternative proposed by the District would have appropriately delivered the OT services required by the June 7, 2004 IEP and its January 5, 2005, addendum. The services would apparently have been delivered by Judith Auston (see above).

57.    Mother testified that Parents rejected the District's in-house alternative because Student needed services in a clinic; he needed services in a separate ("motor") room that the District did not have; and that any change in providers would be too disruptive. She sought support for this view from two documents. The first was an OT assessment by Montez, conducted in April and May 2004, which recommended that Student receive two hours a week of individual therapy, at least one hour of which was "to be provided in a clinic setting." The other was the June 7, 2004 IEP, which followed Montez's recommendation by offering two hours a week of OT, in "clinic and preschool."

58.    Auston testified that Student did not need services in a clinic or separate room. Her testimony was more persuasive than Montez's report, and the IEP that adopted it, for several reasons. First, Auston was substantially more experienced than Montez in the delivery of OT services to school children, including to autistic children. There was no evidence that Montez had any particular experience with autistic children.

59.    Second, Auston was more familiar with Student and in a better position to judge his progress over time. She had been on the team that assessed Student when he entered the District at two years of age. She had assessed him again in October 2005 in preparation for his triennial IEP meeting on January 5, 2006. That second assessment was a year and a half more recent than Montez's assessment, a significant time in the life of a child.

60.    Third, at hearing Auston persuasively defended her opinion that Student did not need true clinic-based services or treatment in a separate motor room. She had spoken to Montez about Kowar's El Cerrito facility, and did not believe it was really a clinic. She was told it was a house with OT equipment in it. A true clinic, Auston testified, is a medical facility, usually housed in a hospital and supervised by a physician. So the OT Student had been receiving from Kowar had never been truly clinic-based services.

61.    Fourth, Student produced no evidence to contradict Auston's opinion. Although Montez testified, she was not asked whether anything had changed since her spring 2004 assessment of student, whether Student still needed clinic-based services in April 2005 when her services ceased, or whether he needed them more recently. Nor was she asked whether Kowar's facility was truly a clinic.

62.    Finally, Student presented no evidence that the District's in-house facilities or equipment were inadequate, that the absence of a separate motor room would have any effect on Student's treatment or progress, or that Auston was not capable of delivering appropriate OT services. While it is true that, in April 2005, Student's outstanding IEP still required one hour of OT in a "clinic" setting, there was no evidence that the District's facilities were any less a "clinic" than Kowar's house in El Cerrito. There was no evidence, beyond Mother's unexplained lay opinion, that a change of providers would have been too disruptive for Student. It certainly would not have been as disruptive as having no OT provider at all, which was the result of Mother's conduct.

63.    Student was not provided any OT services from April 2005 to the end of SY 2004-2005 by the District because Parents refused to continue to pay Kowar and seek reimbursement,[9] continued to insist that the District contract with Kowar, and declined available alternatives. The failure to provide OT services during that period was not the result of any act or omission of the District.

*Speech and language services in SY 2004-2005*

64.    The parties agree that Student received S/L services throughout SY 2004-2005, but dispute whether the District was the entity that provided them. Student argues it was not, because Parents' health insurer paid for the services; therefore the District did not provide services in conformity with his IEP because the insurer provided them instead.

65.    The evidence showed that Student's S/L services at Children's Hospital of Oakland (CHO) were paid for by the insurer, not the District. The District made many efforts to substitute itself as the payor, but could not do so because Parents refused repeated requests to instruct the hospital to cease billing the insurer and bill the District instead. Without such an instruction, CHO was required to continue to bill the insurer.

66.    On Parents' arrival in the District, they obtained S/L services for Student from CHO. The service was delivered by S/L pathologist Mary Gage Herman in a clinic at CHO, and billed to Parents' insurer.

67.    At the June 7, 2004 IEP meeting, Parents accepted the District's offer of S/L services three times a week, 60 minutes a session, by Herman at CHO. The parties understood that the District, which already had a master contract with CHO (an NPA), would essentially assume financial responsibility for Student's current therapy at CHO. Herman attended the meeting and signed the attendance sheet as the attending speech pathologist. She proposed draft speech and language goals and objectives, which were edited and then approved by Parents and the District.

68.    Herman testified that Mother requested that CHO not bill the District for her services. Herman understood that the District wanted to receive the bill, but Mother told her that Parents had not signed the speech and language portion of the June 7, 2004 IEP (which was untrue), and that CHO was not to bill the District for her services.

69.    David Wax, Ph.D. (Wax), was the District's Director of Special Education in SY 2004-2005. He testified that the District wanted to pay CHO for Student's S/L services, and had prepared all the necessary documents to take over paying for Herman's services, including an Individual Services Agreement to be appended to the existing master contract. Cheong told him she had contacted CHO, but was told that CHO could not receive payment from the District while the insurer was being billed. Wax and Cheong repeatedly asked Parents, orally and in writing, to authorize the hospital to cease billing the insurer and begin billing the District, but they did not do so.

---

[9] The parties dispute whether Parents could have continued to pay Kowar if they chose to do so. That dispute need not be resolved here; Parents had and still have rejected at least one adequate alternative.

70.    Cheong confirmed that she asked Parents many times, orally and in writing, to change their billing instructions to CHO, but Parents would not, although they continued to insist that the District pay CHO. Cheong spoke with Mary Kay Therres, CHO's head of accounting, to determine how much the District owed. Therres responded by saying that Parents had directed the hospital in a signed agreement to list the insurer as the payor, and had specifically stated that the District was not to pay. Cheong then attempted to secure an arrangement allowing the District to reimburse the insurer for its previous payments, but could not. Marva Furmidge, CHO's Vice President for Risk and Legal Affairs, then wrote Cheong and District counsel, stating:

> [Parents] have requested that [CHO] bill their health insurance, and the health insurance has paid our bills. Although [CHO] has a signed master contract with [the District] and an individual contract for [Student], [CHO] cannot bill [the District] without the parents' permission. [Parents] have specifically requested that [CHO] continue to bill their private health insurance.

Furmidge also stated that CHO would be unable to "retroactively bill" the District for previous therapy since it had already been paid, and was "not in the position to return the monies to the private insurance company." CHO, she wrote, needed Parents' permission to bill the District for subsequent S/L therapy for Student.

71.    In her testimony, Mother denied that the District asked Parents to instruct CHO to cease billing the insurer and begin billing the District. Her denial was not credible in light of the testimony of Herman, Wax, and Cheong, and the documentary evidence described above.

72.    Mother testified that she never instructed CHO to stop billing the insurer for Herman's services because the CHO S/L services paid for by the insurer were entirely separate from the S/L services the District was obliged to provide under the June 7, 2004 IEP, which were also to be provided by Herman. Mother described the former services as "medical" and the latter as "educational," and stated that she anticipated Student would receive the two kinds of service simultaneously. How Herman could have delivered both kinds of services was not addressed.

73.    Mother's explanation for refusing to allow the District to pay for Student's S/L services at CHO was not credible. Parents never informed the District that they saw a distinction between medical and educational services. They made no attempt to clear up the District's confusion in order to achieve their asserted goal of having two kinds of S/L service simultaneously delivered to Student. The first the District heard of this distinction, or this plan, was at hearing. If Parents had actually sought such a goal, they would have worked with the District to achieve it.

74.    Moreover, although the hospital was billing a health insurer, Herman's S/L services to Student were always educational in nature, not medical. Herman's credentials are educational, not medical. The services Herman described in her written report were educational. Herman appeared at the June 7, 2004 IEP meeting and signed the attendance sheet as "speech pathologist," an educational role, and drafted proposed S/L goals and objectives for the IEP. Student eventually lost Herman's services because CHO changed its speech and language clinic

to a "medical therapy model" (see below). Student produced no proof that he required, was prescribed, or ever received "medical" S/L services.

75.     Throughout SY 2004-2005, the District's inability to pay for Herman's S/L services was the result of Parents' continued insistence that their insurer be billed for those services, not the result of any act or omission of the District. Had parents removed that obstacle, the District would have paid for Herman's services at CHO, and those services would have complied with the S/L requirements of Student's June 7, 2004 IEP. The District did not fail in SY 2004-2005 to deliver S/L services in compliance with Student's IEP; Parents obstructed it from doing so.

*FAPE in SY 2005-2006*

*The delivery of services*

76.     Student contends that, during SY 2005-2006, the District continued to fail to provide him behavioral, OT, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum.

*Behavioral Services in SY 2005-2006*

*CLASS*

77.     Student received ABA services from CLASS from August 29, 2005 (the beginning of SY 2005-2006) through January 27, 2006, but no ABA services for the rest of the school year. Each party argues the other is responsible for that loss.

78.     During fall 2005, Mother became dissatisfied with the services of CLASS. She employed Vicki Wells, a behaviorist (see below), to observe CLASS's interactions with Student and make suggestions for change. She searched for a different ABA provider, communicating extensively with Kevin Dotts, the director of the provider I Can, Too, and invited him to the triennial IEP meeting on January 5, 2006. However, Mother never communicated her displeasure with CLASS either to CLASS or to the District before the triennial meeting.[10]

---

[10] At hearing, Mother and Wells criticized CLASS's services on four grounds: 1) that one staff member, Melinda Lanning, was inadequately trained; 2) that the agency lacked a "behavior plan"; 3) that it ignored Student's behavioral problems; and 4) that it relied too much on discrete trial training and not enough on language instruction. These arguments, if true, might support part of a claim that Student was denied FAPE because of substandard service and a lack of qualified personnel. However, no such claim was made in either of Student's complaints, which alleged only that services were not delivered in conformity with Student's IEP, which required behavioral services of stated frequency and duration. A new claim that FAPE was denied for reasons not set forth in the complaints cannot be decided here. (See Legal Conclusion 34.) Nor would the evidence support such a claim: it showed that CLASS, an NPA, trained Lanning, a new employee, according to its normal standards, and that Lanning handled Student's behavior according to her training. Lanning did not like her new job and resigned in two months, but that does not mean her services were inadequate. It is not clear what Mother and Wells meant by a "behavior plan" or what difference one would have made; Student made no attempt to prove that his behavior was so troublesome that a behavior intervention plan was required by law. (See Legal Conclusion 33.) Wells testified that a CLASS supervisor told her it was the agency's "protocol" to "ignore" undesirable and self-injurious behaviors. This claim seemed exaggerated: it is implausible that an agency providing behavioral services would, as a matter of

79.     Mother sought and obtained permission from Denise Pollard, the executive director of CLASS, and her employees, to videotape CLASS employees while videotaping her son at school and home. Her stated purpose was to make a video for the Autism Education Network (AEN). She requested that a videotape machine be available at the January 5, 2006 triennial IEP meeting.

80.     At the January 5, 2006 triennial IEP meeting, which Pollard attended, Mother played a part of the videotape showing her son interacting with CLASS employees, and used it to criticize CLASS's services. Pollard was surprised and angered by the use of the videotape, made under what she saw as false pretenses, and by the sudden criticism of her agency without prior warning or complaint. Harsh words were exchanged, and Pollard left the meeting. Over the next several days, Pollard informed the District of many accumulated grievances it had with Mother: that she frequently cancelled sessions with little or no notice (affecting employees' pay); left CLASS employees idle outside her house while she and Student were hours late for therapy appointments; and restricted access to the binder they shared in which treatment and behavior information was recorded. In a voicemail to Linda Baker, a District program specialist, Pollard stated that Mother had cancelled another session that day; that none of her staff wanted to continue to work with Mother; that one had quit as the result of cancelled sessions; and others were threatening to quit if not removed from the case.[11] Pollard requested that the District find a way to remove CLASS from Student's case.

81.     On January 12, 2006, CLASS announced it would no longer serve Student. The District responded that, under its contract, CLASS was required to give 20 days' notice of cessation of services. CLASS then agreed to serve Student through February 7, but on January 27 the agency ceased its services, stating that Mother had made continued work impossible. Nothing in the record suggests that Student has received any District-funded ABA services since that day.

*Stepping Stones*

82.     When CLASS refused to continue serving Student, the District searched for another ABA provider. When the triennial IEP meeting resumed on February 14, 2006, the District offered the services of Stepping Stones Center for Autistic Spectrum Disorders (Stepping Stones), an NPA. Mother stated she would call the agency to discuss its services. By March 3, the District had signed a contract with Stepping Stones, and the agency had begun an Assessment

---

policy, simply ignore undesirable behavior. It was more likely a difference of opinion about the best way to handle such behavior. In any event, Lanning's testimony about an incident in which Student struck himself on the head more than 30 times showed that she took several steps, unsuccessfully, to control that behavior. Contemporaneous documents confirmed those efforts. CLASS was not ignoring undesirable behaviors. The criticisms made by Mother and Wells were essentially disagreements about methodology, which is left to a district's discretion as long as the district provides or offers a FAPE. (See Legal Conclusions 19-20.) The fact that Mother did not raise these complaints with CLASS or the District for several weeks suggests that she did not perceive them as urgent at the time.

[11] At hearing, Mother accused CLASS and the District of "conspiring" to make it look as if CLASS's resignation were her fault. However, she produced no evidence to contradict CLASS's charges, other than to say generally that if she cancelled therapy sessions, Student must have been sick on those days.

20

of Basic Language and Learning Skills (ABLLS) of Student, which it routinely required for services to a new client. By March 20, the ABLLS had been completed.

83.     Stepping Stones never provided direct therapy to Student because Parents rejected its services. Vivian Davis-Nichols, the agency's clinical director, testified that Mother brought Student to her office to discuss services, and that a host of problems of communication and viewpoint arose in the following weeks. For example, Mother used a "meet and greet" session with the therapists assigned to Student to distribute a questionnaire probing their experience, and decided they were insufficiently experienced with autistic children. When the agency sent Mother its parent handbook, which described its policies and procedures, Mother sent back a lengthy set of questions and comments setting conditions and seeking alterations. She proposed, for example, that Parents be able to suspend any therapist who was "not working out," and announced that Student would be videotaped at all times. Davis-Nichols testified that, like other ABA agencies, Stepping Stones did not negotiate its policies and procedures with parents when districts were paying for its services. Mother was so informed, and on April 3, 2006, she wrote to the agency announcing her "decision" that "your agency will not be a good match for [Student's] needs."

84.     Mother's opinion that the therapists assigned by Stepping Stones to Student's case were insufficiently qualified was not supported by other evidence. The therapists were qualified in the views of the State, the District, and the agency. Robert Willis, Stepping Stones' regional manager, described the training required by the agency to employ a therapist as a junior or senior therapist. A junior therapist, he testified, would be enrolled in college. He would not necessarily have experience with autistic children, but would almost always have experience handling children in general. Each junior therapist was trained for each new child by a senior therapist, using such methods as videotape, simulated problems and role-play, and testing. A junior therapist would then observe the senior therapist at work before he began to serve the client under the close supervision of the senior therapist. A senior therapist was required to have, or be close to, a Bachelor's degree, and have a minimum of six months (and usually a year) of experience. Both junior and senior therapists are actively overseen by a case supervisor, who determines goals for the student. A case supervisor must have a master's degree in behavioral analysis or a related field, and must pass the agency's test for competence in ABA. Willis testified without contradiction that all three therapists assigned to Student were well trained for the task. One of them met the agency's qualifications for a junior therapist, and the other two met its qualifications for a senior therapist. They had experience with autistic children. The weight of evidence showed that Stepping Stones's assigned therapists were qualified to serve Student.

85.     Student argues that Stepping Stones was not ready, on February 14, 2006, to begin services to Student, because the therapists the agency selected had all been hired since that date, and therefore could not have delivered therapy right away. Even if true, the argument would not justify outright rejection of the agency seven weeks later. More importantly, Student's argument rests upon the erroneous assumption that services do not begin until individual therapy begins. Student's view implies that a district and an agency unduly delay services if they take time to become familiar with a student's needs before therapy starts. On the contrary, as Davis-Nichols of Stepping Stones and occupational therapist Rita Montez both testified, the process of

21

initial assessment, evaluation, or familiarization that agencies routinely employ with new clients is an integral part of services, not a prelude to them. To begin therapy without first determining the child's unique needs would contradict the mandate of IDEA that a child's unique needs be determined and addressed. (See Legal Conclusion 1.)    The evidence showed that Stepping Stones began appropriate service to Student as soon as possible by assessing him and becoming familiar with his needs, and that its therapists were ready to serve Student as soon as possible once his needs had been assessed. It also showed that it was Parents' rejection of the agency, not any staffing shortage or delay by Stepping Stones, that prevented the delivery of services.

86.    Cheong testified without contradiction that by April 2006, when the Parents rejected the services of Stepping Stones, the District had attempted to use for Student every available ABA provider in California that met its standards. As a result, the District adhered to its offer of ABA services by Stepping Stones; Parents adhered to their rejection of the agency; and Student went without District-funded ABA services for the rest of the school year.

87.    Between CLASS's resignation and Mother's rejection of Stepping Stones, no significant part of the delay in providing behavioral services was due to any failure of the District. Nonetheless, the District offered to give Student nine weeks of extra behavioral services, in addition to its IEP offer, to compensate for that gap in service. Parents did not accept.

88.    The interruption of Student's ABA services from January 28, 2006, to the end of SY 2005-2006, was due solely to the actions of Parents, not any act or omission of the District. The District did not fail during that period to deliver ABA services in compliance with Student's IEP; Parents obstructed it from doing so.

*Occupational Therapy in SY 2005-2006*

89.    The impasse between Parents and the District concerning the services of Mary Kowar & Associates continued unresolved throughout SY 2005-2006. Student was not provided any OT services by the District because Parents refused to pay Kowar and seek reimbursement, continued to insist that the District contract with Kowar only, and declined available alternatives. The failure to provide OT services during that period was solely due to Parents' conduct, not any act or omission of the District.

*Speech and Language Services in SY 2005-2006*

90.    In late July 2005, CHO announced it was changing its Speech and Language Center to a medical therapy model and would no longer deliver to clients the S/L services it had been delivering in the past. S/L pathologist Herman notified Parents that her services would cease on August 19, 2005. Parents proposed that Herman be replaced by Melissa Jakubowitz of Jakubowitz Associates, an NPA. Jakubowitz was well qualified: she had 27 years' experience in delivering S/L services, including to autistic children. The District agreed to the substitution and contracted with Jakubowitz, who began delivering S/L services to Student on September 15 in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum. Parents do not claim

that Student suffered any interruption in S/L services between August 19 and September 15. They may have employed Jakubowitz privately earlier than September 15.

91.     In winter 2006, Mother became concerned that Student was not making acceptable progress in speech and language. On March 13, 2006, Mother unilaterally terminated Jakubowitz's services without informing the District. Jakubowitz notified Theresa Anderberg, then the District's Acting Director of Special Education. Anderberg requested that Jakubowitz hold open Student's time slot, and agreed to pay her for the time. Anderberg then wrote and spoke to Mother, notifying her that the service was still available and expressing the District's concern that it was not being utilized. Mother did not respond. Jakubowitz held open Student's time slot until mid-April, but never heard from Parents again.

92.     Student received no District-funded S/L services from March 13, 2006, until the end of SY 2005-2006. This loss was due solely to the actions of Parents, not any act or omission of the District. The District did not fail during that period to deliver S/L services in compliance with Student's IEP; Parents obstructed it from doing so by terminating the services of the District's provider.

*Alleged procedural errors*

*Failing to hold an IEP meeting until January 5, 2006*

93.     Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to hold an IEP meeting concerning Student's program for SY 2005-2006 until January 5, 2006.

94.     Student's agreed-upon IEP Addendum of January 5, 2005, governed his program for one year, and set January 5, 2006, as the date for his triennial review. The District began in spring 2005 to obtain from Parents a date on which triennial assessments could be planned, but Parents did not respond to calls and letters for several weeks. Then the parties exchanged many possible dates, but could not agree on one until August 29. There was no evidence that the District delayed setting a date for the meeting; the calendars of the many participants could not be coordinated until that date.

95.     After the assessments were planned on August 29, 2005, and completed in October or early November, the parties attempted to arrange a triennial meeting before January. Once more they exchanged numerous dates, but could not find one acceptable to all the participants. Finally, the District fixed the date as January 5, 2006, the date on which the triennial IEP meeting had been set by the IEP a year earlier. Student offered no evidence that the District delayed setting the date.

96.     Student produced no evidence that the timing of the triennial IEP meeting had any effect on Parents' participation in the decision-making process, or on Student's education. Student was at all times during the school year in the placement (the Son-Light Preschool) that Parents preferred. The District's offer at the triennial meeting, if accepted, would have kept him in that placement until the end of SY 2005-2006. Any delay in holding that meeting was

23

unavoidable. It did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to provide assessment reports to Parents before the triennial IEP meeting*

97.    Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to give them copies of the triennial assessment reports before the triennial IEP meeting on January 6, 2006.

98.    Following its standard practice, the District gave all the assessment reports to Parents at the IEP meeting. No law required it to do so earlier. (See Legal Conclusion 28.) At the triennial IEP meeting, Parents understood enough about the contents of the assessments to disagree vehemently with all of them and demand an IEE. At their request, the meeting was recessed until January 19, 2006, then to February 14, then to March 30. Parents had ample time between those meetings to study and understand the assessments.

99.    The evidence suggests that Parents would not have done anything with the assessments if they had received them in advance. School psychologist Ilona Novak testified that she sent an advance copy of her psychoeducational assessment to Mother in early October 2005, suggesting that the two meet if Mother had any questions. When Mother did not respond, Novak called her. Mother stated she had not yet read the assessment. Novak again invited questions but received none before the triennial meeting.

100.    The fact that the District did not give its assessments (except for the psychoeducational assessment) to Parents in advance of the triennial IEP meeting had no consequence. It did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to provide timely notice of CLASS's termination of its services*

101.    Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to give them timely notice of CLASS's withdrawal from the delivery of behavioral services. The agency's first termination letter was dated January 12, 2006. After being reminded that it was required to give 20 days' notice, CLASS sent another letter on January 18. Parents were given the second letter at an IEP meeting on January 19. The District's delay in delivering the news was either seven days or one day. In either case, the District's notice to parents of CLASS's withdrawal was prompt and timely.

102.    Student identifies nothing Parents could or would have done if they had learned earlier of CLASS's withdrawal. The relationship between them and CLASS was damaged beyond repair. By the end of the triennial meeting on January 5, 2006, Parents knew of the agency's complaints, but were doing nothing to respond to them. The brief lapse of time between CLASS's announcement of its withdrawal and the District's notification of Parents was of no consequence and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to make an offer of placement to Student at the January 19 and February 14, 2006 IEP meetings*

103.   Student's contention that the District did not make an offer of placement to him at the January 19 and February 14, 2006 meetings is incorrect. At the first meeting, on January 5, the District made a detailed written offer. On page five of the IEP, the District set forth an offer for SY 2005-2006 that essentially left Student in his then-current placement. It described his program and each of his separate services, their frequency and duration, their starting and ending dates, and their location. On page six of the IEP, in identical format, the District offered a program for the Extended School Year (ESY) 2006.[12] And on page seven of the IEP, in identical format, the District offered a program for SY 2006-2007. Each of these parts of the offer was complete and sufficient. (See Legal Conclusion 25.)

104.   The four meetings in 2006, on January 5, January 19, February 14, and March 30, were not separate IEP meetings. They were separate sessions of the same triennial meeting, as their documentation confirms. The latter three occurred because, in each case, Parents requested that the rest of the meeting be postponed. Even if the meetings had been separate, the District was under no obligation to make another offer after January 5. The previous offer was still outstanding, and Parents had not responded to it. If the District did not repeat its January 5 offer on January 19 or February 14, that omission had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to have a representative of the proposed behavioral services provider Stepping Stones present at the February 14, 2006 IEP meeting*

105.   Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to have a Stepping Stones representative present at the February 14, 2006 IEP meeting, when that agency's services were first proposed. Student does not identify any consequence of this failure, and the record shows none. From February 14 to April 3, Parents considered the services of Stepping Stones and communicated with the agency about their services many times and in detail. The absence of an agency representative at the February 14 meeting had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Offering at the March 20, 2006 IEP meeting to place Student at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present*

106.   Student contends that the District significantly impeded Parents' right to participate in the decision-making process by offering at the March 20, 2006 IEP meeting to place Student in the SDC at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present. However, the offer of placement in Haight Elementary School was made at the January 5, 2006 IEP meeting, but Parents declined

---

[12] In each school year addressed here, Student attended the ESY. References to a school year herein include the ESY following the regular school year unless otherwise noted.

to consider it until they received an IEE. It was not until March 30 that Mother requested an opportunity to visit the SDC.

107. The evidence showed that Mother had multiple opportunities to visit the Haight SDC before SY 2005-2006 was over. Mother testified her visit did not occur until June eighth. However, her behavioral expert Vicki Wells accompanied her on at least one of her two visits, and sent Mother a bill for visiting the class in May. Mother and Wells both testified that they observed students in the SDC on those occasions. There was no evidence that Mother asked for an earlier visit, or that the District delayed her visit in any way. There was no urgency; the District's offer would not have placed Student in the SDC until the end of August, and Parents had been refusing to respond to the District's January 5, 2006 offer for months. The timing of Mother's visit to the SDC had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education. Student's contention that the District delayed the visit until students were gone is frivolous.

*The delivery of services in SY 2006-2007*

*Behavioral services in SY 2006-2007*

108. As SY 2006-2007 began, Parents kept Student in the Son-Light Preschool and continued to ignore the District's placement offer of January 5, 2006. The District adhered to its offer of ABA services by Stepping Stones, and Parents adhered to their rejection of the agency. Nothing in the record suggests that Student received any District-funded ABA services in SY 2006-2007.

109. On December 15, 2006, Parents moved for a stay put order, arguing that the stay put placement included Student's enrollment in Son-Light. The District welcomed the motion because it saw a stay put order as an opportunity to revive the delivery of services to Student. It opposed the motion only insofar as it would have required Student to remain in Son-Light, arguing that since promotion from grade to grade is assumed in stay put disputes, the proper stay put placement was in kindergarten in the District's Haight Elementary SDC. On January 16, 2007, Judge Peter Paul Castillo of OAH agreed with the District that the proper stay put placement was in the Haight SDC, granted the motion with that modification, and ordered that all IEP services and supports be kept available pending resolution of these disputes.

110. After the stay put order issued, the District's new Director of Special Education, Rosalind Davenport, checked the availability of service providers so that she could make a new offer to Parents. Since she lacked consent to share information, she did not name Student and spoke only in generalities. On January 19, 2007, she wrote to Parents offering ABA, OT, and S/L services. [13] She renewed the offer of services from the ABA provider Stepping Stones, and enclosed a consent form for the release of information to Stepping Stones "so that the District

---

[13] The District's opposition to the stay put motion also offered services through these providers.

26

may speak with this agency regarding [Student's] behavioral services."[14] Parents did not sign the consent form or return it to the District, or respond in any other way. Davenport telephoned and then wrote Parents again on January 29 and March 2, renewing her request that Parents sign the consent form for Stepping Stones and two other providers (see below). Again Parents did not respond.

111.    Student failed to receive behavioral services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Stepping Stones. The failure was not caused by any act or omission of the District.

*Occupational Therapy Services in SY 2006-2007*

112.    The impasse between Parents and the District concerning the services of Mary Kowar & Associates continued unresolved throughout SY 2006-2007. Student was not provided any OT services because Parents refused to continue to pay Kowar and seek reimbursement, continued to insist that the District contract with Kowar only, and declined available alternatives.

113.    In her January 19, 2007 letter, Davenport offered Student the services of occupational therapist Dory Maxon. She enclosed a consent form for the release of information to Maxon. Parents did not respond.

114.    Sometime in late January or early February, Mother telephoned Maxon, apparently leaving the names of Student and the District, and received a voicemail from Maxon stating that she had not spoken to the District and had never heard of Student. Mother concluded from the voicemail that Maxon was not ready to begin therapy on the day her services were offered, a conclusion that was irrelevant if true (see above).[15] Parents did not return the consent form or take any other action to obtain OT services for Student.

115.    Student failed to receive OT services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Maxon. The failure to deliver OT services was not caused by any act or omission of the District.

*Speech and Language Services in SY 2006-2007*

116.    In her January 19, 2007 letter, Davenport offered Student the services of Progressus Speech Services (Progressus). She enclosed a consent form for the release of information to Progressus. Parents did not respond.

---

[14] The consent form Parents had signed for Stepping Stones in February 2006 provided that "This release is only for the current referral and may not be extended." It would not have authorized the release of information created months after it was signed.

[15] Davenport's direct testimony that she contacted all three proposed providers is entitled to more weight than Mother's description of Maxon's voicemail, which was not introduced in evidence. Maxon did not testify.

117.  Mother testified that she did not respond to Davenport's request because she was unable to reach Progressus to discuss the nature of its services; it did not return her call. The record does not show what message Mother left with Progressus, or why Progressus did not respond. It is not clear how Progressus could have engaged in a discussion of services for Student without knowing something about him. Davenport testified that, to comply with confidentiality laws, the District would release no information to the agency without consent, not even Student's name. Mother would not give consent until she could approve of the agency.

118.  Student failed to receive S/L services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Progressus. The failure was not caused by any act or omission of the District.

*Alleged procedural error in SY 2006-2007: Refusing to convene an IEP meeting from June 20, 2006, to the present*

119.  Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to convene an IEP meeting from June 20, 2006, to the present, even though Mother repeatedly requested such a meeting. On June 30 and July 20, Mother made written requests that the District convene another IEP meeting "to continue the discussion of our son's educational needs." The District did not respond. It had already convened its annual IEP meeting in four separate sessions in 2006. It had no information that Student was failing to progress, that Parents wanted to develop or revise the IEP, or that there existed any new assessment to discuss. The District correctly concluded from Mother's request that her purpose was simply to continue stating her disagreement with the District's offer. The District also correctly concluded that the parties had reached an impasse that only a due process hearing could resolve. In these circumstances, the District was under no obligation to convene another IEP meeting (see Legal Conclusion 30), and its failure to do so did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*The District's offer of FAPE for SY 2006-2007*

*The Haight Elementary SDC for autistic children*

120.  In Case No. 2006100365, the District seeks an order declaring that its placement offer of January 5, 2006, would have provided Student a FAPE in SY 2006-2007 had Parents accepted it.[16] That offer was of placement in the SDC for autistic children at Haight Elementary School. It included four hours a day, five days a week, in the SDC itself; mainstreaming in a general education classroom one hour a day, five days a week; a one-to-one aide at school; 30 minutes of OT twice a week; one hour each of S/L and OT consultation a month; and transportation from home to school and back. It also included numerous services integrated into the SDC's program (see below).

---

[16] In its request, the District sought the same relief for SY 2005-2006, but withdrew that request at the prehearing conference.

121.    The Haight SDC is taught by Michelle Toth, who has worked for the District for three years. Before that she worked for six years for the Redwood City School District as an inclusion specialist. For four years before her work in Redwood City, she was the teacher of an SDC for children with moderate to severe disabilities in the San Francisco Unified School District. In 1992 she received a teaching credential for general education elementary school students, and in 1997 a special education credential for students with moderate to severe disabilities ranging in age from pre-kindergarten to adult.

122.    Toth testified that she has 10 students this year, and is assisted by four paraprofessionals trained in autism, a speech therapist, an occupational therapist, a behavioral specialist, and an adaptive physical education teacher. In training the staff, Toth and the behaviorist emphasize using functional analyses for problem behaviors; preventative strategies to promote appropriate behavior; instructional strategies emphasizing the use of language in place of problem behaviors; and reactive strategies, such as three-step prompting, for non-compliance with adult instructions. She and her staff write positive behavior support plans for specific students who require more intensive behavioral intervention. Staff is trained in the procedures required for each plan, and in data collection techniques for each plan. The class's behavioral strategies include discrete trial training, a technique designed for autistic children in which skills are broken down into component parts that are taught systematically, using repeated presentations. Incidental teaching strategies are also used to take advantage of learning opportunities in naturally occurring situations such as recess, snack time, art, mainstream classrooms, and free play. This helps students generalize skills.

123.    The SDC is highly structured. Because many autistic students experience anxiety as a result of change in routine and transitions, the class follows set routines. The curriculum is language-enriched; that is, language-based and infused with language training. It emphasizes communications skills throughout the day. The speech therapist is present four days a week. She works directly with students two days a week individually and at circle time, and at other times collaborates with Toth on each student's individual program, attends staff meetings, and helps train staff in using S/L strategies in the classroom. Toth and her aides integrate language and communication throughout the day in dealing with a student individually, in group activities, and in facilitated play.

124.    The routine and structure of the SDC are based on the TEACCH (Treatment and Education of Autistic and Communication Handicapped Children) model, which uses visual schedules and routines to help students become more independent. Physical areas of the classroom are set aside for specific functions such as work, art, and reading. TEACCH requires the development of work systems incorporating visual cues, encouraging left to right scanning, and utilizing routine. Novel tasks and materials are taught first one-to-one, and then tried independently. Least-to-most prompting, a gradation of encouragements, is used during independent tasks to prevent prompt dependency. Most teaching is one-to-one.

125.    Some of Toth's students are verbal; some are not. Those who are not communicate using PECS (the Picture Exchange Communications System). The TEACCH method is adapted to individual needs. Each student has a schedule with pictures; those who can read also have icons. When shown a card with his name on it, a student checks his schedule and

locates the appropriate picture or icon. He then matches it with the icon identifying an area of the room, so he knows to go to a particular place. How much language is used depends on the student; some are required to name the place in response to the question "Where do you go next?"

126.    Mainstreaming, which is different from full inclusion,[17] is used for students in Toth's SDC. Student, for example, would be mainstreamed in a general education classroom one hour a day, with appropriate help from his one-to-one aide, and at lunch, recess, and assemblies. This practice provides students with typical peer models for behavior and language, and encourages participation in the larger school community.

127.    In the SDC, social skills are addressed in facilitated play, in structured activities like greetings and interactions, and on the playground with typically developing peers.

128.    Toth attended the January 5, 2006 IEP meeting for Student and heard the assessment reports presented there. She testified that Student seemed like "a good fit" for her classroom; his level of need matched the level of service in the SDC. At hearing, she reviewed Student's proposed goals and objectives, and stated that all of them could be implemented by her and her staff in her classroom. Not every goal would have to be pursued in the SDC; some could be fulfilled in the regular education classroom.

129.    School psychologist Ilana Novak confirmed Toth's testimony. Based on her assessment, Novak thought that Student should be in a highly structured environment with educators who specialize in autism. He would also benefit from mainstreaming. Novak visited Toth's SDC and talked to Toth. She saw the class as highly structured, with a high ratio of adults to children, individualized programs, circle time, free time, mainstreaming, a substantial language component, and a teacher trained to work with autistic students. In her view, the SDC program fit her recommendations.

130.    Occupational therapist Judith Auston noted that, even beyond the specific offer to Student of 30 minutes of OT twice a week and one hour of OT consultation a month, Student would receive a substantial amount of OT in the routine of the SDC. Auston designs a gross motor program and fine motor program for each child in the SDC to do daily. The fine motor program is done during seat work activity and fine motor small group; the gross motor program is supervised by the OT, the teacher, and the aides. Gross motor activity is blended with a social skills program by creating activities between students such as taking turns rolling a ball to each other. Auston participates in staff meetings throughout the year, and trains aides in attempting to make every fine motor activity a therapeutic one. OT, she explained, is embedded in the curriculum of the SDC.

131.    Valerie Coleman, the S/L therapist who conducted the triennial speech and language assessment of Student, did not testify. However, she was assisted in drafting her report by S/L therapist Lois Sonneman, who reviewed a draft of the report. Sonneman is familiar with

---

[17] Mainstreaming is the part-time situating of an SDC student in a general education classroom. Full inclusion is for students based in a general education class all day, for whom the general education teacher is responsible.

30

the Haight SDC. She thought that the District's offer of one hour of S/L consultation a month in the SDC was appropriate. In her opinion, S/L services are delivered there as part of the classroom's regular program, not just independently, in order to promote the generalization of skills into regular settings. She praised the SDC program as language-enriched, and the S/L therapist there for the time she spent working with the teacher.

*Student's criticisms of the SDC*

132.    The sole expert witness who testified in support of Student's claim that the District's offer was inappropriate was Vicki Wells. (Mother's testimony supported Wells's views, but added little to them.) Wells has an associate's degree from the University of California at Santa Barbara in early childhood development, a bachelor's degree from California State University at Sacramento in child development, and a master's degree from California State University at San Francisco in special education with an emphasis in autism and ABA. She has worked in the field of autism for 15 years, including in Lovaas replication studies in collaboration with the Sacramento Regional Center. She has held master contracts with school districts, been employed by SELPAs (Special Education Local Planning Areas), and has received intensive training in ABA while working as an in-class ABA support provider. She currently operates Autism Collaborative Therapies in Oakland. Before 2000, she ran an agency, Synergistic Interventions, that had its NPA status revoked by the State for reasons not in the record. She is not licensed to perform assessments in any particular discipline.

133.    Wells testified that the Haight SDC would be an inappropriate placement for Student for two reasons: that the TEACCH program was wrong for him, and that he needed to be in a full inclusion setting (the least restrictive environment).

134.    Even taken uncritically, Wells's testimony did not support her conclusion that the Haight placement would be inappropriate for Student, because she only addressed whether it would be better or worse than his current situation in Son-Light Preschool. The basis for her opinion was that the Haight placement would be "a step backward" from Student's current situation at Son-Light.    However, whether Son-Light is a better placement than the Haight SDC is irrelevant here, because a district is not required by IDEA to maximize a student's learning opportunities or to provide the best possible placement. (See Legal Conclusion 3.) Wells did not testify that the Haight placement lacked any of the essentials of a FAPE: She did not address whether the Haight placement would meet all of Student's unique needs, or was reasonably calculated to afford him educational benefit. (See Legal Conclusions 1-3.)

135.    Much of Wells's testimony did not reflect adversely on the Haight SDC. She testified, for example, that the staffing was adequate. She did not contradict the testimony of Toth and others that Student would be involved in activities with other children in a language-rich environment.

136.    Wells praised the Son-Light environment as exposing Student to "typical peers," whereas the SDC would not. However, Student's classmates at Son-Light are not his typical peers. He is older than all of them, and twice the age of some. The other 19 students range in

age from two to five. Student will be eight in September 2007, and would have been seven in the month he was enrolled in the Haight SDC had Parents accepted the District's offer.

137.    Wells praised the Son-Light environment as being a typical program utilizing incidental learning, whereas the SDC was more structured. She did not explain why a structured environment was not preferable, and at one point agreed that Student would benefit from one. All other expert witnesses testified that Student should have a highly structured environment.

*TEACCH as a methodology*

138.    Wells testified that the TEACCH methodology was wrong for Student in the SDC, and as used by CLASS. Most of her criticism of the use of TEACCH related to its use by CLASS in the preschool and home. From her observations at the preschool, she concluded that TEACCH was not helping to facilitate Student's language development. She testified that she is TEACCH-trained and does not believe that it is an inappropriate method; she just would not have used it as "a primary" teaching method for Student, although she observed, in apparent approval of TEACCH's premise, that children do need to learn to work independently. Wells uses the method, but usually with children older than Student. She would have structured Student's environment in the preschool differently, and focused more on verbal learning, using a lot of verbal scripting.

139.    Wells testified that she visited the SDC on two occasions, but Toth remembered her visiting only once, and Wells's bill to Mother charged for only one visit. Wells did not describe the duration or timing of her visit, and did not testify that she saw the TEACCH methodology being employed. Toth testified that Wells visited once between eight and nine in the morning. The schedule of the SDC, which is closely followed, provides for arrival, bathroom, and facilitated free time between 8:20 a.m. and 8:45 a.m., circle time between 8:45 a.m. and 9:00 a.m., rotation among TEACCH work stations from 9:00 a.m. to 9:20 a.m., and then snack time. According to Toth, Wells departed at some time during the work station rotation and before snack time. Wells's visit to the SDC, then, allowed her 20 minutes or less to observe the use of the TEACCH method by Toth and her staff, who have more experience and training in its use than the junior CLASS employee Wells observed at the preschool. Acting Special Education Director Annenberg, who accompanied Wells, testified without contradiction that, as Wells departed, she said it looked like a good program to her.

140.    Nothing in Wells's testimony supports Student's argument that the Haight SDC placement would have been inappropriate for him. She did not stay in the SDC long enough to observe the language-enriched curriculum Toth and other District witnesses described, and offered no reason why that curriculum would not have addressed her concerns about language instruction. At best, Wells' testimony supported the view that different methods would have been better for Student. (See Legal Conclusions 1-3.) Wells did not testify that the use of the TEACCH methodology in the SDC would have deprived Student of any of the essentials of a FAPE: she did not address whether use of the method would have met all of Student's unique needs, or was reasonably calculated to afford him educational benefit. (See Legal Conclusions 1-3.)

32

*Least Restrictive Environment*

141.    Student argues that the Haight SDC placement would be inappropriate because it is not a full inclusion setting; i.e., it is not the least restrictive environment in which Student could be educated satisfactorily. That determinaation requires balancing four factors: the academic benefits to Student of placement in a general education setting; the nonacademic benefits of that placement; the effects of that placement on the teacher and other students; and the cost of that placement.[18]  (See Legal Conclusions 7-8.)

*Academic Benefits*

142.    State standards require that public school kindergarten students be taught certain preacademic skills. In the area of English language arts, they must, for example, learn to write words and brief sentences that are legible; listen and respond to stories based on well-known characters; identify characters, settings, and important events; use letters and phonetically spelled words to write about experiences, stories, people, objects, or events; write by moving from left to right and from top to bottom; write uppercase and lowercase letters of the alphabet independently, attending to the form and proper spacing of the letters; recognize and use complete, coherent sentences when speaking; recite short poems, rhymes, and songs; and relate an experience or creative story in a logical sequence. (California State Board of Education Content Standards, English Language Arts, adopted Dec. 1997.) In the area of mathematics, kindergarten students must, for example, learn to count, recognize, represent, name, and order a number of objects (up to 30); know that larger numbers describe sets with more objects in them than smaller numbers have; use concrete objects to determine the answers to addition and subtraction problems (for two numbers that are each less than 10); compare the length, weight, and capacity of objects by making direct comparisons; identify and describe common geometric objects; compare familiar plane and solid objects by common attributes; pose information questions, collect data, and record results using objects, pictures, and picture graphs; and identify, describe, and extend simple patterns (such as circles or triangles) by referring to their shapes, sizes, or colors. (*Id.*, Mathematics, adopted Dec. 1997.) And in the area of science, students must, for example, know that objects can be described in terms of the materials they are made of (clay, cloth, or paper, for example) and their physical properties; know how to observe and describe similarities and differences in the appearance and behavior of plants and animals; know characteristics of mountains, rivers, oceans, valleys, deserts, and local landforms; describe the properties of common objects; and communicate observations orally and through drawings. (*Id.*, Science, adopted Oct. 1998.)

143.    The evidence showed that Student is, and in the near future will be, unable to acquire or participate in learning these required skills. The District's triennial evaluations of Student showed that his developmental level is approximately half that of his typically developing peers, that he is below the first percentile in cognition relative to them, and that he is functioning in the mentally retarded range. At present, he cannot independently form a vertical line in any letter of his name, express himself beyond making one or two word utterances, understand the alphabet, understand what numbers correspond to, or make his desires known by

---

[18]  The District does not argue that placing Student in general education would be unduly costly, so the question is not further addressed here.

means other than gestures or tugging on an adult. Psychologist Novak testified that she did not believe Student "can learn much in the academic setting of a regular classroom; he really needs an individualized program." No witness disagreed. Student presented no evidence that he could benefit in any way from the preacademic instruction in a regular education kindergarten. The evidence showed he could not.

### Non-academic benefits

144.    Student's ability to engage in social interaction with other children is minimal, even with his two to five-year-old colleagues in preschool. Resource specialist Abad testified that, during her observation of Student at his preschool, he did not interact with any other students. Even when touched by another student, he did not turn to respond or show any awareness. He could "parallel play," but did not initiate interaction with other students. Other students had to be prompted to play with him. During her observation, a tutor put another student next to Student for play, but Student made no approach to the other student and did not respond to that child's overtures. When given a choice, Student chose to sit by himself in a corner. S/L pathologist Coleman reported from her observations and caregivers' reports that Student did not respond to greetings or requests from strangers, give appropriate eye contact, initiate conversation, or respond to other children's play requests. He could sit in circle time, but would not engage in the activities of the other students there.

145.    Mother testified that Student socializes well with other students in his preschool, but her testimony was outweighed by that of many other observers. Mother produced and introduced in evidence a video presentation of more than an hour in length that showed Student with his fellow students in class, on the playground, and in the community. Special Education Director Davenport accurately characterized the video as showing that Student was heavily dependent upon his aide and did not interact much with other students. Renate Westbrooks, the Director of Son-Light Preschool, who has been Student's teacher since he entered the school at age two, testified that Student's social skills had improved in his five years at the school, and that he had developed "friendship groups" of students who had "buddied with him." However, asked to describe how Student had benefited socially from being exposed to his classmates, she answered that it was a "difficult question," and that she was not sure Student was "able to distinguish that he's learned anything from them socially." She testified that Student can sit at a circle and at a table with his classmates, but she was not sure they taught him that, or whether he just imitates what he sees them doing. Asked for examples of his social skills, she testified that when all students were cooperating on completing an alphabet puzzle on the floor, he could wait his turn and put his letter in the appropriate place. She also testified he could sing along in circle time. In a letter to psychologist Novak, Westbrooks stated that Student is "clearly ready for more social interaction with his pre-school peers" and that he shows an interest in what his classmates are doing, "especially if they are playing with one of his favorite toys." She added, however, that social development "must be initiated by his therapist if this is not naturally occurring in his environment" and that "much work lies ahead for [Student] in order to prepare him for ... Kindergarten."

34

146.    The only evidence of Student's social skills came from his preschool environment. It supported the inference that Student would have even more difficulty socializing with typically developing peers his own age but twice his developmental level, in a new environment, than he does with younger children in his familiar preschool environment. There was no evidence to the contrary. Student did not attempt to prove that he could benefit from social exposure to his peers in a regular education classroom. The evidence suggested that he could not.

### Effect on the regular education teacher and other students

147.    Student misbehaves in his preschool class, but not to the extent that he is greatly disruptive. Abad and CLASS therapist Lanning reported that in his preschool, Student sometimes hit his head. Wells reported that he wandered from place to place, removed from a felt board the shapes other students had put there to create a picture, and walked through other children's Lego constructions, or dismantled them. Several observers reported he omitted high pitched squeals. However, the video presentation produced by Mother showed -- perhaps selectively -- that Student tolerated the close proximity of others well, and that he was comfortable acting in parallel with them, though not interacting with them. Overall, the evidence showed that Student would likely cause some minor to moderate disruption of a general education classroom, but that it would not be serious or severe.

148.    On balance, the evidence showed that Student would derive little or no academic or nonacademic benefit from inclusion in a regular education classroom, and that he would be mildly or moderately but not greatly disruptive there. The evidence showed, therefore, that Student cannot be educated satisfactorily in a general education classroom (see Legal Conclusions 7-8), and that the District's offer of placement in the Haight SDC was the least restrictive environment in which he could be educated satisfactorily.

149.    In light of the qualifications of the District witnesses Toth, Novak, Auston, and Sonneman, and the plausible details of their consistent descriptions of the Haight SDC, the weight of evidence was that the District's offer would have addressed all of Student's unique needs, and was reasonably calculated to bring him educational benefit.

### Reimbursement

#### The July 13, 2005 request

150.    Parents' claims for reimbursement fall into three categories. First, Parents claim that the District did not completely reimburse them the $21,949.40 they demanded on July 13, 2005, for payments to the OT provider Mary Kowar, the Son-Light Preschool, Student's one-to-one aide, the CHO speech and language clinic, and Dr. Miranda Gabriel, a consultant at Behavior Analysts, Inc. (BAI). On August 15, the District agreed to reimburse Parents (and within a few days did reimburse them) in the amount of $11,749.00. It declined, however, to reimburse them for an additional $10,140.00.

151.    The District withheld $6,445.00 of that amount on the ground that the bills were for services that were either not a part of Student's IEP, or had been paid for by insurance. The District stated that it did not owe for Dr. Gabriel or BAI because those services were not a part of its IEP offer, and that it would not compensate Parents for $2,485 to CHO until it received proper documentation of the expenditure. (The District noted that it believed CHO was being reimbursed by Parents' health insurer (see above).) Parents made no attempt to prove that the services of Gabriel and BAI were part of Student's outstanding IEP, or that they were entitled to reimbursement of those expenses on any other theory. Nor did they attempt to prove that they had submitted proper documentation of any payment to CHO. Therefore Parents failed to prove that they are entitled to compensation for those items.

152.    The District declined to pay $3,695 on the ground that the items comprising that amount had already been paid. It sent Parents a spreadsheet showing that $3,695 in invoices from Kowar, Son-Light, and the one-to-one aide had already been paid. Anderberg explained the calculations in the spreadsheet in her testimony, and the District introduced it in evidence. Parents, who merely restate these claims here, made no attempt to prove that those invoices had not already been paid, and therefore failed to prove that they are entitled to compensation for those items.

*The July 20, 2006 request*

153.    On July 20, 2006, Parents demanded that the District repay them $12,735 for Son-Light Preschool, Student's one-to-one aide, and services from Autism Collaborative Therapies (Vicki Wells). The District paid Parents for Son-Light and the aide, but declined to pay $3,475 for Autism Collaborative Therapies on the grounds that it was not an NPA, that Mother had procured its services unilaterally and outside the IEP process, and that the District was not obliged to pay for outside services when it had an appropriate outstanding IEP offer. Parents restate the demand for Wells' services here, but made no effort to prove that reimbursement for services from Autism Collaborative Therapies is justified on any ground. Parents therefore did not prove that they are entitled to compensation for that item.[19]

*SY 2006-2007 expenditures*

154.    Parents request compensation for three expenditures during SY 2006-2007: $4,410 for tuition for Son-Light Preschool; $5,950 for Student's one-to-one aide; and $3,880.48 for the IEE by Dr. Allison Lowy Apple. The claims for expenses for preschool tuition and the aide are premised on the argument that the District did not offer Student a FAPE for SY 2006-2007. Since it did, Parents are not entitled to reimbursement for those expenditures. As explained above, Parents are also not entitled to reimbursement for the Lowy Apple assessment.

155.    The special education and related services for which the District reimbursed Parents were provided at public expense. (See Legal Conclusion 1.)

---

[19] Parents demanded an additional $433 that the District did not pay, but the record does not reflect the nature of the expenditure, the reason the District declined to reimburse for it, or why Parents claim they are entitled to it. Parents have not, therefore, proved entitlement to that sum.

*Compensatory Education*

156.    Student seeks compensatory education for denial of services in the areas of behavioral support, OT, and S/L therapy (see above). However, the sole responsibility for those denials lies with Parents (see above), so Student is not entitled to compensatory education.

*An immediate IEP team meeting*

157.    Since the District did not violate IDEA by declining to call an IEP meeting from June 20, 2006, to the present, Student is not entitled to an immediate IEP team meeting.

## CONCLUSIONS OF LAW

*Elements of a FAPE*

1.    Under the IDEA and state law, children with disabilities have the right to free appropriate public education (FAPE). (20 U.S.C. § 1400(d); Ed. Code, § 56000.) FAPE means special education and related services that are available to the child at no charge to the parent or guardian, meet State educational standards, and conform to the child's IEP. (20 U.S.C. § 1401(a)(9).) A "free appropriate public education" is defined as:

> special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program ... .

(20 U. S. C. § 1401(9).) "Related services" are transportation and other developmental, corrective and supportive services as may be required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26).) In California, related services are called designated instruction and services (DIS), which must be provided if they may be required to assist the child in benefiting from special education. (Ed. Code, § 56363, subd.(a).)

2.    There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Board of Educ. v. Rowley* (1982) 458 U.S. 176, 206-07 [73 L.Ed.2d 690].) Second, the tribunal must decide whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

3.    In *Rowley*, the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* at 198.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction

and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201; see also, *M.M. v. School Bd.* (11th Cir. 2006) 437 F.3d 1085, 1102-03.)

4.    In determining whether a district offered a student a FAPE, the proper focus is on the adequacy of the District's placement, not on any alternative proposal. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)

5.    An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

6.    When a school district does not perform exactly as called for by an IEP, the district does not violate the IDEA unless it is shown to have "materially failed to implement the child's IEP. A material failure occurs when the services provided to a disabled child fall significantly short of those required by the IEP." (*Van Duyn v. Baker School Dist. 5J* (9th Cir. 2007) 481 F.3d 770, 773.) A brief gap in the delivery of services, for example, may not be a material failure. (*Sarah Z. v. Menlo Park City School Dist.* (N.D.Cal., May 30, 2007, No. C 06-4098 PJH) 2007 U.S.Dist. LEXIS 39025, pp. 22-23.) And a brief delay in the commencement of related services may be justified, depending upon the circumstances giving rise to the delay. (*D.D. v. New York City Bd. of Educ.* (2d Cir. 2006) 465 F.3d 503, 508.)

*Least Restrictive Environment*

7.    Federal and state law also require a school district to provide special education in the least restrictive environment (LRE). A special education student must be educated with nondisabled peers "to the maximum extent appropriate," and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (20 U.S.C. § 1412 (a)(5)(A); 34 C.F.R. § 300.550(b); Ed. Code, § 56364.2, subd. (a).) A placement must foster maximum interaction between disabled students and their nondisabled peers "in a manner that is appropriate to the needs of both." (Ed. Code, § 56031.) The Supreme Court has noted, however, that IDEA's use of the word "appropriate" reflects Congressional recognition "that some settings simply are not suitable environments for the participation of some handicapped children." (*Rowley, supra,* 458 U.S. at 197.)

8.    The IDEA establishes a strong preference in favor of the placement of a special education student in the LRE. (20 U.S.C. § 1412 (a)(5)(A); *Rowley, supra,* 458 U.S. at 181 n.4; *Poolaw v. Bishop* (9th Cir. 1995) 67 F.3d 830, 834.) In light of this preference, and in order to measure whether a placement is in the LRE, the Ninth Circuit, in *Sacramento City Unified Sch. Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1403, has adopted a balancing test that requires the consideration of four factors:

(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the student] had on the teacher and children in the regular class, and (4) the costs of mainstreaming the [student].

*Requirements for Assessments*

9.       Before any action is taken with respect to the initial placement of an individual with exceptional needs, an assessment of the pupil's educational needs shall be conducted. (Ed. Code, § 56320.) Thereafter, special education students must be reassessed annually or more frequently, if conditions warrant, or if the pupil demonstrates a lack of progress, or the parent or teacher requests a meeting to develop, review, or revise the IEP. (Ed. Code, §§ 56343, 56381.) The student must be assessed in all areas related to his suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or determining an appropriate educational program for the student. (20 U.S.C. § 1414 (b)(2); Ed. Code, § 56320, subd.(e), (f).) Tests and assessment materials must be administered by trained personnel in conformance with the instructions provided by the producer of such tests. (20 U.S.C. § 1414(b)(2), (3); Ed. Code, § 56320, subd. (a), (b).)

10.       Assessments must be conducted by individuals who are both "knowledgeable of [the student's] disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area." (Ed. Code, §§ 56320, subd. (g), 56322; see 20 U.S.C. § 1414(b)(3)(A)(iv).) A psychological assessment must be performed by a credentialed school psychologist. (Ed. Code, § 56324.) Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's primary language or other mode of communication unless this is clearly not feasible. (20 U.S.C. § 1414(a)(2), (3); Ed. Code, § 56320, subd. (a).)

11.       *Determination of Issue No. 1:* The District's triennial assessments of Student were not inaccurate. Based on Factual Findings 4-17, Student failed to prove that the assessments were inaccurate or in violation of law in any way.

*Independent Educational Assessment (IEE)*

12.       When a parent disagrees with an assessment obtained by the public educational agency, the parent has the right to an independent educational evaluation (IEE) from qualified specialists at public expense, unless the educational agency is able to demonstrate at a due process hearing that its assessment was appropriate. (Ed. Code, § 56329, subd. (b), (c).)

13.       *Determination of Issue No. 2:* The District should not have reimbursed Parents for the IEE conducted by Dr. Allison Lowy Apple. Based on Factual Findings 18-30, the IEE was obtained and conducted before, and therefore not because of disagreement with, the District's triennial assessments.

14.    *Determination of Issue No. 7:* The District offered Student a FAPE for SY 2006-2007 by offering to place him in the SDC at Haight Elementary School with related services and supports. Based on Factual Findings 120-149, the offer addressed all his unique needs, and was reasonably calculated to bring him educational benefit. The SDC, on balance, was the least restrictive environment in which he could be satisfactorily educated, because he would not have benefited academically or nonacademically in a general education kindergarten class, and his presence there would have been mildly to moderately disruptive to the teacher and other students.

*Related Services*

15.    The IDEA requires that an eligible student receive related services, such as transportation and developmental, corrective, and other supportive services, "as may be required to assist a child with a disability to benefit from special education." (14 U.S.C. § 1401(a)(26).) The services must be "sufficient ... to permit the child to benefit educationally from that instruction." (*Rowley, supra,* 458 U.S. at p. 203.)

16.    California law equates related services with "designated instruction and services" (DIS), and, like federal law, requires that an eligible student receive them "as may be required to assist" the student "to benefit from special education." (Ed. Code, §§ 56031, 60010, subd. (h).)

*Contracting with Service Providers*

17.    Part 30 of Division Four of the Education Code (§ 56000 et seq.), which governs special education, sets forth the conditions under which a school district may contract with an entity outside the district for special education and services. Pursuant to that Part, a district may make such a contract only if the outside establishment or individual is certified by the California Department of Education under certain standards.

18.    A nonpublic, nonsectarian agency is defined by Education Code section 56035 as:

a private, nonsectarian establishment or individual that provides related services necessary for an individual with exceptional needs to benefit educationally from the pupil's educational program pursuant to an individualized education program and that is certified by the department.

Such an individual or agency may be certified by meeting the detailed requirements, and following the procedures, of Education Code section 56366.1. When certified, it may enter into a master contract with a school district containing the provisions required by Education Code section 56366, one of which is an undertaking to give 20 days' notice before terminating the contract. However, if such an establishment or individual is not certified pursuant to section 56366.1, a contract is not authorized. Section 56366, subdivision (d), provides:

[A] master contract for special education and related services provided by a nonpublic, nonsectarian school or agency may not be authorized under this part, unless the school or agency has been certified as meeting those standards relating

to the required special education and specified related services and facilities for individuals with exceptional needs.

Unless the agency has been certified, "no master contract may be negotiated by the local educational agency." (*California Ass'n of Private Special Education Schools v. State Dep't of Educ.* (2006) 141 Cal.App.4th 360, 369.)

*Right to determine methodologies and service providers*

19.    In *Rowley*, the Supreme Court held that courts must refrain from imposing their views of preferable educational methods upon school districts because courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. (*Rowley, supra*, 458 U.S. at p. 208.) Accordingly, as long as the requirements of IDEA are satisfied, "questions of methodology are for resolution by the State." (*Ibid.*)

20.    Federal courts of appeal have consistently interpreted *Rowley* to mean that, as long as a district provides or offers a FAPE, the choice of methodology is up to the district, not the parent. (*Gill v. Columbia 93 School Dist.* (8th Cir. 2000) 217 F.3d 1027, 1036-37; *Barnett v. Fairfax County School Bd.* (4th Cir. 1991) 927 F.2d 146, 152; *Lachman v. Illinois State Bd. of Educ.* (7th Cir. 1988) 852 F.2d 290, 296-97; see also, *M.M. v. Sch. Bd., supra*, 437 F.3d at pp.1102-03; *Adams v. Oregon, supra*, 195 F.3d at 1149-50.)

21.    Like the choice of methodology, the choice of service provider is also up to the district, as long as it offers or provides a FAPE. As held in *N.R. v. San Ramon Valley Unified School Dist.* (N.D.Cal., Jan. 25, 2007, No. C 06-1987 MHP) 2007 U.S. Dist. LEXIS 9135:

> [Student] is not entitled to his choice of service providers. See *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 885 (D. Minn. 2003) (holding that the district's refusal to assign the service provider of plaintiff's choice did not constitute a denial of FAPE). The Act requires only that the service provider be able to meet his needs.

The IDEA "does not empower parents to make unilateral decisions about programs the public funds." (*O'Dell v. Special School Dist.* (E.D. Mo., March 30, 2007, No. 4:05 CV 2090 DDN) 47 IDELR 216; see also, *Gellerman v. Calaveras Unified School Dist.* (9th Cir., July 25, 2002, No. 00-17205) (unpublished), 37 IDELR 125 [Parents not entitled to have Student's home-based aide work with him in school where school had assigned qualified paraprofessional].)

*Parental obstruction*

22.    A district does not fail to implement an IEP if, because of parental obstruction, it cannot do so. (See, *Doe v. Defendant 1* (6th Cir. 1990) 898 F.2d 1186, 1191; see also, *Cone v. Randolph County Schools Bd. of Educ.* (M.D.N.C., Oct. 20, 2006, No. 1:06CV00579) 46 IDELR 250; *Glendale Unified School Dist. v. Almasi* (C.D.Cal. 2000) 122 F.Supp.2d 1093, 1109-10; *B.G. v. Cranford Bd. of Educ.* (D.N.J. 1988) 702 F.Supp.1158, 1165-66; *Student v. Riverside Unified School Dist.*, OAH Case No. N2005110775 (May 5, 2006)[" It is patently unfair to

determine that the District has failed to offer a FAPE where the parents are the source of the failure."].)

23.    *Determination of Issues No. 3, 4(a), and 5:*  The District did not deny Student a FAPE by failing to provide behavioral, OT, or S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum in SYs 2004-2005, 2005-2006, or 2006-2007.  Based on Factual Findings 31-92 and 108-118, every interruption in service was caused solely by Parents, not by any act or omission of the District.

*Procedural Requirements*

24.    In *Rowley*, the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA.  (*Rowley, supra*, at pp. 205-06.)  However, a procedural error does not automatically require a finding that a FAPE was denied.  Since July 1, 2005, the IDEA has codified the pre-existing rule that a procedural violation results in a denial of FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process, or causes a deprivation of educational benefits.  (20 U.S.C. § 1415(f)(3)(E)(ii); see, *W.G. v. Board of Trustees of Target Range School. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

25.    An IEP must include a statement of the child's present levels of educational performance; a statement of measurable annual goals; a statement of the "extent ... to which" a child will not participate in a regular classroom with nondisabled children; a statement of the special education and related services to be provided, and their frequency, duration, and location; and a statement of how the child's progress toward the annual goals will be measured.  (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.347(a); Ed. Code, § 56345, subds. (a)(1), (2), (3).)  A district must make a formal written offer in the IEP that clearly identifies the proposed program.  (*Union School Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526.)

*Parental Participation in IEP Process*

26.    Federal and state law require that parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, assessment, educational placement, and provision of a FAPE to their child.  (34 C.F.R. § 300.501(a), (c); Ed. Code, §§ 56304, 56342.5.)  School officials and staff do not predetermine an IEP simply by meeting to review and discuss a child's evaluation and programming in advance of an IEP meeting.  (*N.L. v. Knox County Schs.* (6th Cir. 2003) 315 F.2d 688, 693 n.3.)  However, a school district that predetermines the child's program and does not consider the parents' requests with an open mind has denied the parents' right to participate in the IEP process.  (*Deal v. Hamilton County Bd. of Educ.* (6th Cir. 2004) 392 F.3d 840, 858.)

27.    A parent is a required member of the IEP team.  (20 U.S.C. § 1414(d)(1)(B)(i); 34 C.F.R. § 300.344(a)(1); Ed. Code, § 56341, subd. (b)(1).)  The team must consider the concerns of the parents throughout the IEP process.  (20 U.S.C. § 1414(c)(1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.343(c)(2)(iii), 300.346(a)(1)(i), (b), 300.533 (a)(1)(i); Ed. Code, § 56341.1, subds. (a)(1), (d)(3), (e).)  While the IEP team should work toward reaching a

42

consensus, the school district has the ultimate responsibility to determine that the IEP offers a FAPE. (App.A to 34 C.F.R. Part 300, Notice of Interpretation, 64 Fed. Reg. 12473 (Mar. 12, 1999).)

28.    Education Code section 56329, subdivision (a)(3), requires that a copy of an assessment report "shall be given to the parent or guardian." However, neither that provision nor any other provision of special education law identifies the time by which an assessment must be given to a parent or guardian.

29.    A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools, supra*, 315 F.3d at p. 693.) A parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way. (*Fuhrmann v. East Hanover Bd. of Educ., supra*, 993 F.2d at 1036.) A school district does not deny parental participation when it considers, but does not adopt, parental views. (*O'Dell v. Special School Dist.* (E.D.Mo., March 30, 2007) No. ___ , 47 IDELR 216.)

30.    An IEP team meeting must be convened at least annually, and whenever a student receives an initial formal assessment, demonstrates a lack of progress, or a parent or teacher requests a meeting to develop, review, or revise the IEP. (Ed. Code, § 56343.) One "take it or leave it" IEP meeting is insufficient to permit adequate parental participation, but four meetings are sufficient to allow parents to address their concerns. (*Student v. Poway Unified School Dist.*, OAH Case No. N2006010985, July 10, 2006.) If an annual IEP meeting has already been held, and the student has not been assessed in the interim, a district need not accede to parents' desire to have another IEP meeting simply to express their continued disagreement. (*Student v. Colton Joint Unified School Dist.*, OAH Case No. N2005080436, Feb. 22, 2006.)

31.    *Determination of Issue 4(b):* The District did not violate the IDEA's procedural provisions in its dealings with Student or Parents. Based on Factual Findings 93-96, the delay in convening the IEP meeting of January 5, 2006, was unavoidable, and without consequence to Parents or Student. Based on Factual Findings 97-100, and Legal Conclusion 28, the District was not required to furnish its triennial assessments to Parents before the January 5, 2006 IEP meeting, and its failure to do so was without consequence to Parents or Student. Based on Factual Findings 101-104, the District timely provided notice to Parents of the withdrawal of CLASS from the provision of services to Student. Based on Factual Findings 103-04, the District made an offer of placement to Student on January 5, 2006, and had no reason to repeat it in subsequent sessions of the same meeting on January 19 and February 14. Based on Factual Finding 105, the fact that the District did not have a representative of Stepping Stones at the February 14, 2006 IEP meeting was without consequence to Parents or Student. Based on Factual Findings 106-107, the District did not prevent Parents from observing the Haight Elementary School SDC until June 8, 2006, or until students were not present.

32.    *Determination of Issue No. 6:* The District did not violate the procedural requirements of IDEA in SY 2006-2007 by refusing to convene an IEP meeting from June 20, 2006, to the present. Based on Factual Finding 119, and Legal Conclusion 30, the District

correctly determined that Parents' disagreements with the outstanding IEP offer had been thoroughly aired in four previous meetings, and that they sought another IEP meeting only to continue to express the same disagreements.

*Requirement of a behavior intervention plan*

33.    If a child's behavior impedes his learning or that of others, an IEP team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i); Ed. Code § 56341.1, subd. (b)(1).) The IEP team must consider a behavior intervention plan when the student exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of her IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) A serious behavior problem is behavior that is self-injurious or assaultive, causes serious property damage, or is pervasive and maladaptive and not effectively controlled by the instructional and behavioral approaches specified in the student's IEP. (*Id.*, subd. 3001(aa).)

*Limitation of Issues*

34    A party requesting a due process hearing may not raise issues at the hearing that were not raised in the request for due process hearing, unless the other party agrees otherwise. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1465.)

35.    A district responding to a request for reimbursement for an IEE "may initiate a due process hearing pursuant to Chapter 5 (commencing with Section 56500) to show that its assessment is appropriate." (Ed. Code, § 56329, subd. (c).) No provision of law authorizes a hearing officer to rule that an assessment is appropriate, unless the district initiates a hearing to make that showing and seek that ruling.

*Reimbursement*

36.    Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when the school district has failed to provide a FAPE, and the private placement or services were appropriate under the IDEA and replaced services that the district failed to provide. (20 U.S.C. § 1412(a)(10)(C); *School Committee of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 369-371.) Parents may receive reimbursement for their unilateral placement if the placement met the child's needs and provided the child with educational benefit. However, the parents' unilateral placement is not required to meet all requirements of the IDEA. (*Florence County Sch. Dist. Four v. Carter* (1993) 510 U.S. 7, 13-14.)

37.    Based on Factual Findings 150-55, Parents are not entitled to any additional reimbursement beyond the monies they have already received for services provided at public expense.

44

*Burden of Proof*

38.    Petitioner has the burden of proving the essential elements of his claim. (Schaffer v. Weast (2005) 546 U.S. 56, 62 [163 L.Ed.2d 387].)

39.    *Determination of Issue No. Eight:* Based on Factual Findings 1-155 and Legal Conclusions 1-38 , Student is not entitled to relief.

## ORDER

For the foregoing reasons, Petitioner's requests in Case Nos. N2006090010 and N2006100740 are denied. The District's request in Case No. N2006100365 is granted: the District offered Student a FAPE for SY 2006-2007 by offering to place him in the SDC at Haight Elementary School, with related services and supports.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires this decision to indicate the extent to which each party prevailed on each issue heard and decided. The District prevailed on all issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety (90) days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated: June 19, 2007

CHARLES MARSON
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **June 19, 2007**, I served a copy of the following entitled action:

**DECISION - OAH CASE NOs. – 2006090010/2006100365/2006100740**

to each of the person(s) named below, at the address set out next to each name, by the following method:

Linda and Francis Pedraza
22 Souza Court
Alameda, CA 94502

Karen E Samman, Esq.
Lozano Smith Attorneys at Law
2000 Crow Canyon Place, Suite 200
San Ramon, CA 94583-1344

☒ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

XX  Regular Mail

☐ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number , pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**4:12 PM** on the **19** of **June**, 2007. _____
                                                                    Rosie Ruiz