1   LINDA PEDRAZA
    **Name and Address**
2   22 Sayre Ct
3   Alameda, CA 94502
4

FILED

08 JUL 25 PH 3: 01

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5   # UNITED STATES DISTRICT COURT
6   # NORTHERN DISTRICT OF CALIFORNIA

7

8   Case No.   C07- 05989 VRW
             C07- 04781 VRW
             C05- 04977 VRW
9   PEDRAZA et. al.
10  **Plaintiff / Petitioner**

    **Document Name:**
11  VS.
12                          Exhibits to Plaintiffs
13  Alameda Unified Sbl. Dist. et al.   Notice of Supplemental
14  **Defendant / Respondent**          Complaint Factual Allegations
15                                      and Claims.

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# COMPROMISE AND RELEASE AGREEMENT

### In Re: Michael Pedraza and the Alameda Unified School District

This Compromise and Release Agreement ("Agreement") is entered among Francisco and Linda Pedraza, the parents of Michael Pedraza (Francisco, Linda Pedraza are, collectively, referred to herein as the "Parent" or "Parents"), and the Alameda Unified School District ("District"), who in consideration of the promises made herein, agree as follows:

1. <u>Nature and Status of Dispute</u>

    A.  Michael Pedraza ("Student" or "Michael") is a child with autism whose Parents reside within the boundaries of the District. Michael turned three (3) years old on October 25, 2002. On or about October 23, 2002, through the IEP process, the District offered Michael placement in the District. The Parents disagreed with the appropriateness of that proposed placement.

    B.  The purpose of this Agreement is to resolve any and all disputes, causes of action, and claims concerning Student's education, including but not limited to Student's special education and related services, arising or occurring up to the date of this Agreement and through June 18, 2004 in order to avoid the need for a due process hearing or other litigation or proceeding based on federal or state law relating to Student's educational program or placement, based on the terms set forth below.

2. <u>Actions to Resolve Dispute</u>

    A.  Within thirty (30) days of full execution of this Agreement, the District shall pay Parent the total sum of two thousand dollars ($2,000). The settlement check shall be made payable to: "Francisco and Linda Pedraza and Varma & Clancy, Attorneys at Law." Said payment will be delivered, by U.S. mail, to the Law Offices of Varma & Clancy, 910 Florin Road, Suite 212, Sacramento, California 95831.

    B.  If the Parents confirm, in writing, that Student receives services from CARD as of July 25, 2003, the District agrees to directly fund Student's program with the Center for Autism and Related Disorders, Inc. ("CARD") of San Jose, California for the 2003/04 school year, and ending on June 18, 2004. Said program shall be comprised of the following: (a) Twenty-five (25) hours per week of direct in-home therapy; (b) Up to six (6) hours per month of activities for CARD supervisors for oversight of Michael's CARD program; (c) Up to four (4) hours per month of "clinical attendance" for each clinical therapist working with Michael (not to exceed three clinical therapists).

C.    If the Parents confirm, in writing, that Michael attends Son-Light Preschool
as of July 25, 2003, the District will reimburse the Parents for the costs they
incur for Michael's placement at Son-Light Preschool, Alameda, California,
not to exceed ten (10) hours per week.

Additionally, the District agrees to reimburse Parents for the cost they incur
for one CARD-trained paraprofessional/aide (hereinafter referred to as
"paraprofessional") to provide services while Michael attends Son-Light
Preschool. Parties agree that the services subject to reimbursement shall not
exceed ten (10) hours per week and that the hourly rate for such services
shall not exceed $18.00 per hour. Furthermore, District agrees to pay for
CARD to train Michael's paraprofessional, but the Parties agree that
District's liability for both the paraprofessional and the CARD supervisor
shall not exceed twelve (12) hours of training during the 2003/04 school
year, and ending on June 18, 2004. Parties agree that District will pay for
the training provided by the CARD supervisor at a rate not to exceed $125
per hour. District agrees to pay for Michael's CARD-trained
paraprofessional to attend two CARD bi-monthly, clinical meetings, but the
parties agree that this liability shall be limited to no more than four (4) hours
per month. Finally, District agrees to reimburse Michael's CARD-trained
paraprofessional for mileage incurred in travel to and from the bi-monthly
clinical meetings at a rate of 36.5 cent per mile with any round trip not to
exceed 100 miles.

D.    If the Parents confirm, in writing, that Michael receives services from Suma
Kids as of July 25, 2003, the District will reimburse the Parents for the costs
they incur for Michael to receive occupational therapy services, sixty (60)
minutes per week, with Suma Kids, Concord, California, for the 2003/04
school year, and ending on June 18, 2004. Said reimbursement includes the
time charged by Suma Kids for their time to attend Michael's IEP team
meetings and to write reports requested by the IEP team.

E.    If the Parents confirm, in writing, that Michael receives speech/language
services from Children's Hospital of Oakland as of July 25, 2003, the
District will directly fund two sixty (60) minute sessions per week of
speech/language therapy services provided to Michael by Children's
Hospital of Oakland, California, for the 2003/04 school year, and ending on
June 18, 2004. This includes the time charged by Children's Hospital of
Oakland for attending Michael's IEP team meetings and to write reports
requested by the IEP team.

F.    Within thirty (30) days of full execution of this Agreement, the District will
reimburse the Parents for the costs they, themselves, have incurred, from
December 1, 2002 through the date of this Agreement, for:
1) Michael's tuition at Son-Light Preschool, and, 2) the paraprofessional
that has accompanied Michael to Son-Light Preschool. As of July 25, 2003,
the costs for said reimbursement was $3,128.00.

G.  The District will reimburse the Parents for no more than two (2) round trips per month for attendance at CARD meetings in San Jose, California at the rate of 36.5 cents per mile with any round trip not to exceed 100 miles during the 2003/04 school year, and ending on June 18, 2004. Parties agree that any reimbursement must be claimed within thirty (30) days of said trip or the right to request reimbursement for that particular trip is waived.

H.  The placement referenced in paragraphs (B) through (E), will be from the term of the next convened IEP team meeting for Student through the regular 2003-2004 school year, which ends on June 18, 2004. These services are to be provided for at least 46 weeks in one calendar year. Parties agree that there will be no gap of longer than two (2) weeks in the provision of services during the 2003/04 school year.

I.  The next convened IEP team meeting will take place within 30 school days of the date of this Agreement. At that time, the aforementioned placement, referenced in paragraphs (B) through (E), will be written into the IEP document.

J.  Parties agree that an IEP will be convened no later than March 20, 2004 to make a placement and services offer for Michael for the 2004/05 school year.

K.  The provision of services listed in paragraphs (B) through (E) are dependent upon the following contingencies:

   (1)  The Parents will cooperate in having Michael's service providers attend future IEP team meetings. For purposes of this paragraph, "cooperate" means a good faith effort to secure the providers' participation at the IEP team meeting, by phone or (preferably) in person; and,

   (2)  The Parents provide a full release to exchange information and documentation between the District and Michael's service providers. The Parents will also provide a release to exchange information and documentation between the District and East Bay Regional Center in regard to CARD services provided for Michael by the East Bay Regional Center.

L.  Reimbursements to the Parents by the District, per this Agreement, will be made within thirty (30) calendar days of receipt by the District of proof of costs incurred by Parents. For purposes of this paragraph, "proof of costs" would be comprised of billing invoices from the service providers in addition to proof of payments made by the Parents (i.e., a check

accompanied by written notice from the Parent that the check had been paid to the respective vendor).

M.   Parents expressly agree that this Agreement resolves any and all issues regarding Student's education that were raised, or could be raised, by either party in a due process proceeding, arising or occurring up to the date of full execution of this Agreement, as well as any future claims as discussed later in this Agreement under Section 4, "Release of Future Claims."

N.   Within three (3) business days following execution of this Agreement by all Parties, Parents agree to take *Michael Pedraza v. Alameda Unified School District*, SN03-01426, off-calendar.

O.   Within thirty (30) business days after payments made pursuant to Sections 2.A. and 2.F. of this Agreement, and in exchange for all promises and payments made under this Agreement, Parents shall dismiss the currently pending due process hearing before SEHO, *Michael Pedraza v. Alameda Unified School District*, SN03-01426, with prejudice.

3.   <u>Release of Past and Present Claims</u>

Parent releases the District including, but not limited to its past and present officials, employees, successors, predecessors, assigns, agents, attorneys, consultants, affiliates, and representatives (collectively "the parties hereby released") of and from any and all matters, claims, obligations, actions, judgments, damages, liabilities, demands, complaints, and causes of action related to Student's education that were raised or could have been raised in a due process proceeding, which Parent now has or holds, or at any time had or held against the parties hereby released up to and including the date of full execution of this Agreement.

4.   <u>Release of Future Claims</u>

A.   The Parents agree that by executing this Agreement, they waive any and all matters, claims, obligations, actions, judgments, damages, liabilities, demands, complaints and causes of action related to Student's education against the District including, but not limited to, its officials, employees, successors, predecessors, assigns, agents, attorneys, consultants, affiliates, and representatives, from the date of this Agreement through June 18, 2004, unless there is an unforeseen change in the Student's needs from that which currently exists requiring a change in educational-related services.

B.   If, during the course of this Agreement, Parents allege that a change in educational-related services is required, Parent agrees to allow the District to conduct an assessment of Student relating to the Student's pertinent needs that are alleged to require the change in services. Parents' signature on this Agreement constitutes consent to the assessments. Parents agree to make Student available for the assessments upon five (5) days notice. Parent agrees that the District shall have the right to complete the assessment, if

determined necessary by the District, per statute, and convene an IEP team meeting to make an offer of FAPE.

C.    The Parents reserve the right to pursue claims for any alleged failure by the District, CARD, Suma Kids, or Children's Hospital to provide the frequency and duration of services described in this Agreement. Parties agree that parents may request an IEP meeting to discuss Michael's services and that District shall convene that IEP within twenty (20) days after that request. Furthermore, if the Parents allege that the private providers have failed to provide the agreed upon frequency and duration of services, the District must be provided with written notice of the alleged failure, specifically stating the date and amount of time that services were not provided. Said written notice must be provided within thirty (30) days of the alleged failure. If timely written notice is not provided, the Parents' claim is waived. Upon receipt of said written notice, the District will have sixty (60) days to provide compensatory services or a comparable placement to the Parents for any missing services alleged.

5.    Acknowledgment of FAPE

Parents agree that the CARD program and other services, as outlined in this Agreement, constitute an appropriate placement for Student during the 2002-2003 school year, 2003 extended school year, and 2003-2004 school year. Parents agree that the CARD program and other services, as outlined in this Agreement, constitute a free, appropriate public education ("FAPE") for Student. Parents agree that the services provided in this Agreement for the 2002-2003 school year, 2003 extended school year, and 2003-2004 school year, constitute an offer of FAPE by the District.

6.    Indemnification

Parties agree that the Parents will defend the District and its Board members, officers, agents, and employees against all claims for damages for death or injury to persons or property including without limitations all consequential damages, from any cause whatsoever arising from or connected with the service hereunder, whether or not resulting from the negligence of the Parents, its agents, contractors or employees to the extent Parents' homeowner's insurance provides coverage. Parent agrees to provide a copy of the homeowner's policy to the District upon request.

Parents shall indemnify, defend and hold harmless the District, its Board members, officers, employees, and agents from and against any and all claims or demands, and every liability, loss, damages or expense, causes of action, lawsuits, complaints, losses, costs, or any other legal proceeding or relief, including but not limited to, state or federal income tax actions, complaints, claims, assessments, liens, costs or damages, attorney's fees and costs, arising out of the acts or omissions by Parents, their agents, contractors, or employees in the course of rendering services(s) under this Agreement, and shall further indemnify and hold harmless the District, its officers, employees, or agents, from and against any and all claims arising from any

breach or default in the performance of any obligation on the Parents' part to be performed under the terms of this Agreement, or arising from any negligence of Parents, or any of Parents' agents, contractors, or employees, and from and against all costs, attorneys' fees and costs, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon; and in case any action or proceeding brought against the District by reason of any such claim, upon notice from the District, the Parents shall defend the same at the Parents' expense.

This is not to be construed as a replacement for District workers compensation claims for any injuries suffered by District employees while visiting the home program.

7.    Relocation

The parties agree that the District shall have no obligation to continue the funding specified in this Agreement should the Parents move their residence from the boundaries of the District.

8.    Unknown Claims

   A.    Parent waives the application of California Civil Code section 1542 as to special education disputes regarding Student addressed in this Agreement. The section reads as follows:

        A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

   B.    Parent understands and acknowledges the significance and consequence of this waiver of California Civil Code section 1542, as follows:

        (1)    Parent may have additional claims and attorney's fees or costs concerning Student's special education issues that were, or could have been, raised in a due process hearing arising or occurring up to the date of full execution of this Agreement, of which Parent is not now aware;

        (2)    Parent may not make a further demand for any claims, fees, or costs as described in paragraphs (B)(1), above, upon the District or its predecessors, successors, boards, employees, or agents; and

        (3)    Parent extends this waiver to include claims, fees, or costs as described in paragraphs (B)(1), above, that are now unknown or later discovered.

9.    Advice of Attorney

The Parent warrants and represents that, in executing this Agreement, she relied upon legal advice from the attorney of her choice; that the terms of this Agreement have been read and its consequences (including risks, complications, and costs) have been

completely explained to her by that attorney; and that she fully understands the terms of this Agreement. She further acknowledges and represents that, in executing this Agreement, she has not relied on any inducements, promises, or representations other than those stated in this Agreement.

10.  Conditions of Execution

Each party acknowledges and warrants that the party's execution of this Agreement is free and voluntary.

11.  Execution of Other Documents

Each party to this Agreement shall cooperate fully in the execution of any and all other documents and the completion of any additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

12.  Nonadmission

This Agreement is not, and shall not be construed as, an admission of liability, fault or wrongdoing of any kind by any of the parties hereto.

13.  Entire Agreement

This Agreement contains the entire Agreement between the parties. A breach of any portion of this Agreement shall be considered a breach of the whole Agreement. Should either party breach any portion of this Agreement, the breaching party shall forfeit any and all consideration promised or received under the terms of this Agreement.

14.  Effective Date

This Agreement shall be effective after execution by the parties.

15.  Governing Law

This Agreement is entered into, and shall be construed and interpreted in accordance with, the laws of the State of California and the United States.

16.  Severability

If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, that determination shall not invalidate or render unenforceable any other provision of this Agreement.

The parties agree that this Agreement and the terms and conditions hereof shall be maintained in strict confidence, and that neither they nor their attorneys shall disclose any information regarding this Agreement, the terms and conditions hereof, any negotiations leading to this Agreement, or the fact that the matter has settled, unless required to disclose such information by law or as necessary to implement this Agreement.

18.    Signatures in Counterparts

This agreement may be signed in counterparts such that signatures appear on separate signature pages. A copy, facsimile transmission, or original of this document with all signature pages appended together shall be deemed a fully-executed agreement.

Dated:_____

_____
Linda Pedraza, Parent


Dated:_____

_____
Francisco Pedraza, Parent


Dated:_____

_____
Dr. Alan Nishino, Superintendent
Alameda Unified School District


APPROVED AS TO FORM:


Dated:_____

_____
Roberta S. Savage
Varma & Clancy
Attorneys for Parent


Dated:_____

_____
John F. Hubanks
Lozano Smith
Attorneys for Alameda Unified School District


M0026897.WPD

Page 8 of 8

'25 03 10:57a      Varma An Clancy           916 429 085          P.10

FROM :PEDRAZA LINDA              HP LEGAL    FAX NO. :510 749-7872      Jul. 25 2003 10:44AM P1
         JUL 25 2003 10:39AM                                          Jul 25
    FM :PEDRAZA LINDA                         FAX NO. :510 749-7872
         Jul 24 03 09:40a      Varma And Clancy            916 429 4085          P.8
         JUL-23-2003 16:43      LOZANO SMITH

The parties agree that this Agreement and the terms and conditions hereof shall be
maintained in strict confidence, and that neither they nor their attorneys shall disclose
any information regarding this Agreement, the terms and conditions hereof, any
negotiations leading to this Agreement, or the fact that the matter has settled, unless
required to disclose such information by law or as necessary to implement this
Agreement.

18.    **Signatures In Counterpart**

This agreement may be signed in counterparts such that signatures appear on separate
signature pages. A copy, facsimile transmission, or original of this document with all
signature pages appended together shall be deemed a fully-executed agreement.

Dated: 7/24/03

_____
Linda Pedraza, Parent

Dated: 7/24/03

_____
Francisco Pedraza, Parent

Dated: _____

_____
Dr. Alan Nishino, Superintendent
Alameda Unified School District

APPROVED AS TO FORM:

Dated: _____

_____
Roberta S. Savage
Varma & Clancy
Attorneys for Parent

Dated: _____

_____
John F. Holmzka
Lozano Smith
Attorneys for Alameda Unified School District

                                            Page 8 of 8

                                            TOTAL  P.09

17.    Confidentiality

The parties agree that this Agreement and the terms and conditions hereof shall be maintained in strict confidence, and that neither they nor their attorneys shall disclose any information regarding this Agreement, the terms and conditions hereof, any negotiations leading to this Agreement, or the fact that the mater has settled, unless required to disclose such information by law or as necessary to implement this Agreement.

18.    Signatures in Counterparts

This agreement may be signed in counterparts such that signatures appear on separate signature pages. A copy, facsimile transmission, or original of this document with all signature pages appended together shall be deemed a fully-executed agreement.

Dated:_____          _____
                           Linda Pedraza, Parent

Dated:_____          _____
                           Francisco Pedraza, Parent

Dated:_____          _____
                           Dr. Alan Nishino, Superintendent
                           Alameda Unified School District

APPROVED AS TO FORM:

Dated:_____          _____
                           Roberta S. Savage
                           Varma & Clancy
                           Attorneys for Parent

Dated: 7/25/63             _____
                           John F. Hubanks
                           Lozano Smith
                           Attorneys for Alameda Unified School District

M0026897.WPD                    Page 8 of 8

The parties agree that this Agreement and the terms and conditions hereof shall be maintained in strict confidence, and that neither they nor their attorneys shall disclose any information regarding this Agreement, the terms and conditions hereof, any negotiations leading to this Agreement, or the fact that the matter has settled, unless required to disclose such information by law or as necessary to implement this Agreement.

18.    Signatures in Counterparts

This agreement may be signed in counterparts such that signatures appear on separate signature pages. A copy, facsimile transmission, or original of this document with all signature pages appended together shall be deemed a fully-executed agreement.

Dated: _____    _____
                          Linda Pedraza, Parent

Dated: _____    _____
                          Francisco Pedraza, Parent

Dated: _____    _____
                          Dr. Alan Nishino, Superintendent
                          Alameda Unified School District

APPROVED AS TO FORM:

Dated: 7/25/03    _____
                  Roberta S. Savage
                  Varma & Clancy
                  Attorneys for Parent

Dated: _____    _____
                          John F. Eubanks
                          Lozano Smith
                          Attorneys for Alameda Unified School District

M0024297.WPD    Page 8 of 8

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>MICHAEL PEDRAZA,<br><br>      Petitioner,<br><br>vs.<br><br>ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>      Respondent. | OAH Case No.: N2005080598<br><br>**DETERMINATION OF SUFFICIENCY OF DUE PROCESS COMPLAINT AND ORDER** |

On August 19, 2005, petitioner Michael Pedraza, through his parents Francisco Pedraza and Linda Hayne-Pedraza, filed a "Mediation and Due Process Hearing Request" alleging that respondent Alameda Unified School District (AUSD) failed to provide petitioner a free appropriate public education (FAPE). On August 26, 2005, respondent AUSD, through their attorney Karen L. Samman, filed a motion to dismiss arguing that Office of Administrative Hearings (OAH) did not have jurisdiction and, in the alternative, that the due process complaint was insufficient to meet the requirements of Title 20 United States Code section 1415(b)(7)(A). On August 30, 2005, respondent sent a follow-up letter to OAH withdrawing the claim of insufficiency but still arguing a lack of jurisdiction. Petitioner filed a response on August 31, 2005.

## DISCUSSION

Petitioner's due process complaint alleges that respondent denied petitioner FAPE under two different theories. The first theory, which relates to the 2003-2004 school year, asserts that respondent violated a mediated settlement that both parties entered into in July 2003. Pursuant to that agreement, the parents agreed that the services outlined in the agreement constituted a FAPE for the school year 2003-2004 school year. The mediated settlement was part of a compliance complaint investigation conducted by California Department of Education (CDE). CDE issued an amended report of that investigation with findings on May 10, 2004. Petitioner

mentions in his complaint that respondent has not fulfilled their obligations under the mediated settlement and that CDE has not responded to petitioner's letters seeking assistance.

Respondent contends that OAH does not have jurisdiction over the mediated settlement reached in July 2003, because mediated settlements are subject to the jurisdiction of CDE pursuant to California Code of Regulations, title 5, section 4650, subdivision (a)(v).[1]  Respondent is correct. OAH does not have jurisdiction over violations of mediated settlement agreements. While petitioner has artfully drafted the due process complaint to include a denial of FAPE during the school year covered by the mediated settlement and the CDE investigation, the theory remains that respondent has violated FAPE by failing to live up to their obligations under the mediated settlement. Violations of mediated settlement agreements are clearly within the purview of CDE. Petitioner has recourse other than through OAH, including filing suit in state or federal court, when a state agency is not fulfilling its legal obligations.

Respondent has withdrawn any objection to petitioner's second theory that AUSD has denied petitioner a FAPE for the 2004-2005 school year by failing to provide services as required by the June 7, 2004 IEP. That portion of petitioner's due process complaint will be deemed sufficient.

## ORDER

1.    Petitioner's allegations related to a denial of FAPE for the school year 2003-2004 are dismissed for lack of jurisdiction pursuant to California Code of Regulations, title 5, section 4650(a)(v).

2.    Petitioner's allegations regarding a denial of FAPE for the school year 2004-2005 based upon a June 7, 2004 IEP are deemed sufficient.

Dated:   September 2, 2005,

RICHARD M. CLARK
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

---

[1] California Code of Regulations, title 5, section 4650 states in relevant part: "(a) The Superintendent shall directly intervene without waiting for local agency action if one or more of the following conditions exists: (v) The complainant alleges that the local educational agency failed or refused to implement the final decision resulting from its local agency investigation or local Mediation Agreement."

# Exhibit 2

# CALIFORNIA DEPARTMENT OF EDUCATION
# COMPLIANCE INVESTIGATION CASE # S-0226-03/04
### RECONSIDERATION REPORT

**Roberta Savage**
(Complainant)

**Michael Pedraza**
(Student)

**Judy Hagenauer, Ph. D.**
(Complaint Investigator, Original Report)

**Carol Purcell**
(Complaint Investigator, Reconsideration Report)

**Alameda City Unified School District**
(Public Education Agency)

**2200 Central Avenue**
Alameda, CA 94501-4450
(Address)

**Alan Nishino**
(Superintendent)

**Alameda**
(County)

| CITATION: | ALLEGATION: |
|---|---|
| Title 5, California Code of Regulations (5 CCR) section (§) 4661(b)(4) | Failure to implement the mediation agreement of 7/25/03 |

**METHOD OF INVESTIGATION:**

A request for information was sent to the District via facsimile and mail on 10/06/03. Telephone interviews were conducted with the Complainant (an attorney) on 11/18/03 and District counsel on 10/24/03 and 11/18/03. All documentation submitted by the Complainant and the District was reviewed in preparation of this report.

The original report completed on 12/1/03, found the District in compliance regarding implementation of a 7/25/03 mediation agreement. In a 1/05/04 letter the Complainant requested reconsideration, alleging the original report was factually incorrect, that that master contracts were not signed and that required services were not provided. On 2/06/04 the request for reconsideration was approved; the reconsideration was based upon the submission of information that conflicted with the original report and that could affect the original determination of compliance. Although the evidence findings of the original report are placed in a different sequential order in the Reconsideration Report, the original report remains largely intact; deleted language is in "strike-through" format and new language is in "bold" format.

The reconsideration report complaint investigator reviewed the original letter of complaint, compliance report and supporting documents, correspondence of 1/05/04 from the Complainant and supporting documentation, including a response of 2/6/04 from the District in opposition to the parent's request for reconsideration. Telephone interviews were held with District counsel on 2/13/04 and 2/18/04, with the Complainant on 4/12/04 and with the student's parent on 2/6/04 and 4/13/04. The District, by fax, was requested to provide additional information on 4/13/04 and responded by fax on 4/20/04. The Complainant and District were provided draft findings to review for accuracy and both parties responded. All documentation submitted by the Complainant and the District was reviewed in preparation of this report.

**POSITION OF PARTIES:**

1. The Complainant alleges that the District failed to implement a mediation agreement of 7/25/03.

2. The District maintains that it is in compliance.

**EVIDENCE:**

1. The 9/26/03 letter of complaint reads, "On or around July 25, 2003, [student's] parents and the [the District] entered into a settlement agreement outlining services for [student] for the 2003-2004 school year... Since that agreement, the District has indicated that the 2003-2004 school year began on or around September 2, 2003. As of today, the District has failed to enter into contracts with [named autism center], and [named children's hospital] as agreed upon. This failure has resulted in a loss of services to [student]. In addition, the District has failed to execute a completed IEP document in order to outline his IEP services as agreed upon in the settlement. In writing, [the student's parents] have agreed that an IEP team meeting is not required in order for the services to be incorporated into an IEP document for their review and signature. This still has not occurred.. "

Reconsideration Compliance Report #S-0226-03/04

2. The 7/25/03 Compromise And Release Agreement between the parents and the District includes the following "Actions to Resolve Dispute":

- "Within thirty (30) days of full execution of this Agreement, the District shall pay Parents the total sum of two thousand dollars ($2,000)..." This payment is not in dispute.
- "If the Parents confirm, in writing, that Student receives services from [autism center] as of July 25, 2008, the District agrees to directly fund Student's program...,for the 2003/04 school year, and ending on June 18, 2004. Said program shall be comprised of the following: (a) Twenty-five (25) hours per week of direct in-home therapy; (b) Up to six (6) hours per month of activities...(c) Up to four (4) hours per month of 'clinical attendance' for each clinical therapist."
- Behavior services were provided for the 2003/04 schoolyear beginning on 9/4/03. Email on 9/15/03 between the autism agency and the parent reveal that the parent and agency disagreed regarding administrative and clinical implementation issues, with respect to the student's availability, missing appointments, a private room to provide service, and that the required hours of service were offered but not provided due to these disagreements. The agency contacted the District in mid-September regarding the disputes and the District convened an IEP team meeting on 10/14/03. The agency provided notice of the termination of services at the student's 10/14/03 IEP team meeting and services were discontinued on 11/3/03. The District reports, "A log of services provided by [the nonpublic agency] during the 2003-04 schoolyear, which was several hundred pages in length, was...provided by the District to the parent, at some point following the parents' termination of the non-public agency's) services...the District does have a copy of this voluminous log in its possession, and will provide a copy to CDE if you would like..."
- The parents did not agree to the proposed IEP of 10/14/03 and requested by letter, an assessment by a neuropsychologist and increase in pre-school hours; the District declined the request and declined to pay for the assessment by a neuropsychologist.
- At an IEP team meeting of 3/17/04, the parents refused behavioral services offered by the District through a non-public agency; the parents at that meeting informed the District that they had independently pursued a behavior assessment and services from a different provider. A permission form for the Exchange of Information between the District and parent-selected agency was signed, but revoked by the parents on 3/24/04. As of 4/20/04 the District was unaware of the status of the student's current behavioral services.
- In a 4/20/04 letter the District also states, "The parents recently revoked consent for...service providers to exchange information with the District, therefore, the District can not be sure as to what services [the student] may be receiving at present". The parents, in an e-mail to CDE of 4/19/04 state, in part, "There is currently no intensive behavior program for our son..."
- If the Parents confirm, in writing, that [student] attends [pre-school] as of July 25, 2003, the District will reimburse the Parents for the costs they incur for [student's] placement...not to exceed ten (10) hours per week.
- Additionally, the District agrees to reimburse Parents for the cost they incur for one [autism center] trained paraprofessional/aide ..to provide services while [student] attends [pre-school]. Parties agree that the services subject to reimbursement shall not exceed ten (10) hours per week and that the hourly rate for such services shall not exceed $18.00 per hour....
- The student's parents provided copies of billing statements and cancelled checks of payment for preschool tuition for the months of September-November, 2003.
- The District acknowledges on a proposed IEP of 12/15/03 that "The parents request reimbursement for September through December 2003 preschool tuition and OT services... [District] to verify timely payment of preschool tuition and OT services".
- In a 2/17/04 letter to the parent the District states, "The (preschool) invoices submitted for January, 2004 tuition did not demonstrate proof of payment...proof of payment must be in the form of an invoice with a notation of payment or a cancelled check (front and back)..."
- In e-mail sent to CDE on 4/19/04 the parents state, "We pay for our son's pre-school attendance three hours per day, five days weekly, and his shadow aide. The District has not reimbursed us according to the terms of the Agreement". The District, in a response to CDE of 4/20/04 disagrees, stating, "All requests for reimbursement have been made and are current and up to date. There are no outstanding requests for reimbursements from the parents".
- If the Parents confirm, in writing, that [student] receives services from [occupational therapist] as of July 25, 2003, the District will reimburse the Parents for the costs they incur for [student] to receive occupational therapy services, sixty (60) minutes per week.. and ending on June 18, 2004 .
- The parents provide copies of billing statements and cancelled checks for the provision of OT services for the months of September, October and an unverified fax of 10/9/03 requesting payment from the District.

2

Reconsideration Compliance Report AS-0226-03/01

- The District acknowledges on a proposed IEP of 12/15/03 that, "The parents request reimbursement for September through December 2003 preschool tuition and OT services... [District] to verify timely payment of preschool tuition and OT services".
- The District, in a response to CDE of 4/20/04 states, "All requests for reimbursement have been made and are current and up to date. There are no outstanding requests for reimbursements from the parents".
- If the Parents confirm, in writing, that [student] receives speech/language services from [Children's Hospital] as of July 25, 2003, the District will directly fund two sixty (60) minute sessions per week of speech/language therapy services provided to [student]... and ending on June 18, 2004...
- In a letter of 11/17/03 to CDE, the District states, "With respect to [Children's Hospital], the...[student] is currently receiving speech/language services pursuant to the Agreement. The District does acknowledge that there was a delay in getting the contract submitted... However, the District is informed that [student] received services after September 3 and the District acknowledges its duty to reimburse the parents for those services...the Agreement does not require the District to enter into a contract with [Children's Hospital]...District has never denied reimbursement to parents for any services obtained from [Children's Hospital]...
- The 12/15/03 IEP indicated that the District "needed to make arrangements" with Children's Hospital for payment of services. As of 1/05/04 the billing statement from Children's Hospital did not reflect payment from the District.
- The District reports in a letter to CDE of 2/6/04 that "after the parent first advised the District in December 2003 that they were "paying" for these services (speech and language), the District immediately asked them to provide it with billing invoices and receipts...to date the parents have not provided the District with any proof of such payments"
- In a response of 4/20/03 to CDE, the District states, "The Master Contract between the District and Children's Hospital...for services and the Individual Service Agreement...for speech and language services...were signed [on] 11/13/03. Children's Hospital...informed the District that the parents requested that Children's Hospital...not allow the District to pay for past and current speech and language services for [the student), and that such services remain being billed to the parent's insurer...enclosed please find the 4/16/04 letter [Children's Hospital to District]...confirming such facts...Children's Hospital cannot bill (the District) without the parent's permission...the Parents have specifically requested that Children's Hospital continue to bill their private health insurance".
- In a 4/16/04 letter the Children's Hospital reports it is providing speech therapy twice weekly to the student and it is their position that, "[The parents have consented to this treatment... [The parents] have signed the Conditions of Admissions that included acknowledgement that they are responsible for payment for...services...[the parents] have requested that [the Hospital] bill their health insurance, and the health insurance has paid our bills. Although [the Hospital] has a signed master contract with [the District] and an individual contract for [the student], [the Hospital] cannot bill [the District] without the parent's permission...[the parents] have specifically requested that [the Hospital] continue to bill their private health insurance".
- "Within thirty (30) days of full execution of this Agreement, the District will reimburse the Parents for the costs they, themselves, have incurred, from December 1, 2002 through the date of this Agreement, for: 1) [student's] tuition at [pre-school], and 2) the paraprofessional that has accompanied [student] to [pre-school]. As of July 25, 2003, the costs for said reimbursement was $3,128.00..."
- The Complainant provided the following documentation of reimbursement: a copy of a District warrant of $3,288 dated 1/05/04 for unspecified services described as "Invoice-Aug to Nov 03"; a copy of a District warrant of $1,342.00 dated 1/12/04 with an invoice date of 11/9/03 for unspecified services; and a copy of a District warrant of $270.00 dated 1/20/04 described as payment for a mediation agreement. In a 4/19/04 letter the Complainant points out, "The payments made by the District do not clearly outline the cost being paid".
- "The next convened IEP team meeting will take place within 30 school days of the date of this Agreement At that time, the aforementioned placement...will be written into the IEP document..."
- An IEP team was convened on 8/30/03.
- "Parties agree that an IEP will be convened no later than March 20, 2004 to make a placement and services offer for [student] for the 2004/05 school-year."
- IEP meetings were held on 12/15/03 and 3/17/04. The District offered an educational program and behavioral services from a specified non-public agency; the parents refused and stated they had independently pursued a behavior assessment and services from a different provider.
- "Reimbursements to the Parents by the District, per this Agreement, will be made within thirty (30) calendar days of receipt by the District of proof of costs incurred by Parents . 'proof of costs' would be comprised of billing invoices from the service providers in addition to proof of payments made by the parents ."

3

Reconsideration Compliance Report #S-0226-03/04

- The District acknowledges that payment for pre-school and OT services were not made in a timely manner. E-mail dated 9/15/03 from the student's parent to the Case Supervisor at the autism center reads, "...the contract that [District] provided you some three weeks ago still has not been processed. This matter needs to be addressed immediately..."

3. E-mail dated 9/15/03 from the student's parent to the Case Supervisor at the autism center reads, "...the contract that [District] provided you some three weeks ago still has not been processed. This matter needs to be addressed immediately. "

4. In e-mail dated 9/15/03 to the student's parent the Case Supervisor at the autism center responds. ". regarding the contract sent by [the District], as we discussed two weeks ago, the contract is blank (both the master contract & the individual service agreement). I have made every attempt to contact [District program specialist] for [student] via e-mail and phone..."

5. In 9/24/03 e-mail to the District the student's parent reports, "I am writing regarding the status of the [autism center] contract that you were supposed to have processed and completed... meeting with [autism center] today, I was informed that [District] after some two months, still has not provided [autism center] with a contract to pay for [student's] services. Additionally, the district has also failed to contract with [children's hospital] for [student's] speech and language as agreed upon "

6. A 10/14/03 letter from the parents to the IEP team reads, "Over the last nine months the [autism center] has assisted our son, [student] with a number of behavioral issues and problems relating to his diagnosis of autism... During this period of time my husband and I have observed [student] benefiting positively from this type of behavioral program when it is provided on a consistent basis. Likewise, we see how it adversely affects our son when the services are not provided consistently."

7. A 10/17/03 letter from the student's parents reads, "... the district's action has resulted in the loss of our son's intensive behavior program, and the district has failed to provide contracts with [children's hospital] for his speech and language. We still do not have an IEP document, and the district still has not reimbursed us.. "

8. An 11/18/03 telephone interview with the Complainant revealed the following:

   - "Parents did receive the initial two payments from the District and reimbursements prior to September and October...
   - The Agreement states that the District must arrange or contract to pay directly an autism behavioral services provider, such as the [autism center], and the [named] children's hospital...
   - The only contract forthcoming was a blank one which the provider was hesitant to sign and for which they received no specifics or directions...
   - The Agreement specifies that the District will incorporate the outlined services per the Agreement into the IEP.. This was never done correctly despite corrections provided to them...
   - We had an IEP on 10/14/03 and the parents were very disturbed by accusations by the previous [autism center] representative. who had terminated services to the student, they said, over disagreements of administrative and clinical issues between themselves and the parents ..
   - When the District proposed a replacement autism behavioral services provider, the parents did not agree because there was no contact or other information included..."

9. The 11/17/03 letter/response from District counsel reads as follows.

   - "The District's position is that it was never out of compliance with the Agreement. There is no dispute that the Agreement obligates the District to provide [student] with educational services designed to meet his autistic needs during the 2003/2004 school year, which began September 2, 2003. Under the Agreement, the District agreed to provide services through a network of private providers, including [children's hospital]...and [autism center]...
   - "...disagreements arose between [autism center] and student's parents...numerous disagreements were substantial services were being affected...disagreements . reached an impasse, the District convened an emergency IEP team meeting on October 14, 2003, at which time [autism center] announced that it would terminate services on November 3, 2003. District's program specialist [named] made numerous attempts to contact the parent to begin the transition process...to an alternative program provider. The parents did not respond to those efforts until...November 10, 2003, which did not indicate whether they agreed with the proposed replacement. Currently the District is scheduling an IEP to offer a replacement provider...
   - The District has twice submitted an IEP to parent's legal counsel for review and signature, including an IEP shortly after the October 14 team meeting. The parents have refused to sign these IEP

4

agreements...compliance complaint concedes that the parent have agreed that an IEP document is not required to implement the agreement...District's legal counsel has asked the parent's legal counsel to specify the alleged inadequacies with the draft IEP documents, including the most recent IEP of October 14, 2003. She has refused to offer any level of specificity. ."

10. During a 11/20/03 telephone interview with a District Program Specialist/Psychologist, she stated, "The District does have and has had ongoing Master Contracts with the [children's hospital] for speech and language services and [autism center]. The student has continued to receive services from both institutions until October 14[th] when [autism center] stated that it would discontinue services after 11/03/03 due to irresolvable disagreements between the autism center and the parent. The individual Service Agreements did get delayed with both institutions as they went back and forth getting the exact language into agreement, but all services were ongoing as per the Mediation Agreement and Master Contracts and the parent accepted those services."

11. The District submitted copies of Master Contracts between the District and the Children's Hospital for "Language/Speech Therapy – individual, 2-60 min. sessions/week ending 6/18/04" and the autism center for "Therapy, 50 hrs @ 25 hrs/wk – 180 days; Clinic Attendance, 50 hrs per month @ 12 hrs/mos., Supervision (6 hrs/month $125/hr; Training – 12 hrs/year @ $125/hr ...through 6/18/04." Both contracts are dated 2/11/04 and signed by all parties.

12. A request from the complaint investigator was made to both the student's parent and the Complainant by telephone message on 11/18/03 for a copy of the service log, which was used as a communication device between the parent and the autism center. No record of service hours or logbook was forthcoming

13. The 11/20/03 telephone interview with the District Program Specialist also revealed, "Since we all agreed that the student does need in-home services, I then investigated other autism providers and settled on two which have the best match with the student's needs. I called and e-mailed this information to the parent and her attorney but received no response. Both providers have waiting lists and I didn't want the student to be without services. Regarding the incorporation of the Agreement services into the IEP, I believe that has been done."

14. The student's 10/14/03 IEP was reviewed. The services as per Mediation Agreement were enumerated in the category of Placement/Services, including, "Regular Education-Preschool at [pre-school], Occupational Therapy at [named provider], Speech Therapy at [children's hospital] and in-home tutorial/supervision services with [autism center], anticipated duration until 6/18/04." The student's parents both signed agreement to this IEP as being in attendance at the IEP team meeting but did not indicate agreement.

## FINDINGS OF FACT:

1. ~~The District did maintain Master Contracts with the autism center and the Children's Hospital to which the District was to provide direct payment as per the mediation agreement.~~

2. The student did continue to receive services from both institutions as per the mediation agreement until the autism center terminated services to the student beginning November 3rd.

3. While the District offered to provide a log of services "hundreds of pages in length" it could not provide succinct information related to the actual number of hours provided to the student by the non-public agency providing behavioral services.

4. The District did not have a master contract or individual service agreement in place with Children's Hospital or the autism center for the student when the special education services were initiated for the 2003/04 schoolyear.

5. The District did not issue develop an individual service agreement with to the Children's Hospital and with to the autism provider in a timely manner. However, the student ~~continued to~~ receive received services from both providers, ~~under a continuing Master Contract with the District.~~

6. The District did incorporate the services as per the mediation agreement into the student's proposed 10/14/03 IEP. ~~the services as per the mediation agreement.~~

7. The District did not provide a specified total number of hours to show that the required autism services have been provided; the offer of "hundreds of pages" of service logs is deemed ambiguous without a verified summary.

5

Reconsideration Compliance Report #3-0226 03/04

8.  The District provides insufficient evidence and a lack of clarity to show that reimbursement payments have been made to the parents for pre-school and OT services in a timely manner.

9.  The Settlement Agreement does not require specific "proof of payment" beyond a copy of the check paid and an invoice.

CONCLUSION:

The District is in out of compliance.

CORRECTIVE ACTIONS:

Prior to 6/15/04, the District shall:

1.  Convene the student's IEP team to review the student's current needs and shall document their consideration of compensatory services. Acceptable evidence would include a copy of the IEP documenting agreement to a current program for the student OR documentation that the parties have agreed to participate in dispute resolution activity, mediation or due process.  If dispute resolution and/or mediation does not result in a settlement agreement and appropriate program for the student, the District shall ensure FAPE by initiating due process prior to 7/15/04.

2.  Provide a statement of assurance to CDE, signed by a District administrator, that the District has reviewed their procedures for timely reimbursement to parents, and that a monitoring procedure is in place to ensure implementation. Acceptable evidence would include a copy of the reimbursement procedures and the signed original statement of assurance.

3.  Review master contract agreements and individual service agreements to ensure there is an appropriate exchange of information between the District and the contracting parties and a documented procedure for verification that required services have been provided. Acceptable evidence would include copies of the procedures, and a statement signed by a District administrator verifying that: (a) procedures are in place for an appropriate exchange of information between the District its contractors, and (b) procedures are in place to verify the provision of required services.

4.  Provide a statement of assurance, signed by a District administrator, that the District's procedures for "Proof of payment" are applied uniformly to all requests made to the District for reimbursement. Acceptable evidence would include the original signed statement of assurance.

5.  Review and clarify payment procedures to Children's Hospital for IEP related speech and language services, including the role of the private insurance company, District payment per the master contract, and clarify reimbursement (and proof of payment) procedures to the parents. Acceptable evidence would include a written description of the payment procedures to Children's Hospital and to other service providers specified on the student's IEP.

EVIDENCE OF REQUIRED CORRECTIVE ACTION SHALL BE SENT DIRECTLY TO:

California Department of Education
Special Education Division
Focused Monitoring and Technical Assistance Unit – Region Three
Attention: Christine Pittman, Manager
1430 N Street, Suite 2401
Sacramento, CA 95814
(916) 327-8966

Alice D. Parker, Ed.D., Assistant Superintendent
Director, Special Education Division

Date: May 10, 2004

6



**CALIFORNIA
DEPARTMENT OF
EDUCATION**

1430 N STREET
SACRAMENTO, CA
95814-5901

**JACK O'CONNELL**
State Superintendent of
Public Instruction
PNE: (916) 319-0800

May 10, 2004

Roberta Savage
910 Florin Rd. #212
Sacramento, CA 95831

Alan Nishino, Superintendent
Alameda City Unified School District
2200 Central Ave.
Alameda, CA 94501-4450

RE:    COMPLIANCE INVESTIGATION:   Case # S-0226-03/04 RECONSIDERATION
           STUDENT NAME:   Michael Pedraza

Dear Ms. Savage and Superintendent Nishino:

The purpose of this correspondence is to inform you that Compliance Report # S-0226-03/04 has been amended due to a reconsideration. A copy of the amended report is enclosed for your records.

Should you have any questions related to the investigation process or to the amended report, I may be reached at (916) 445-4632.

Sincerely,

Carol Purcell by JH

Carol Purcell
Special Education Consultant
Complaints Management and Mediation Unit
Special Education Division

cc:    James Gilletly, Special Education Director
          David Wax, SELPA Director

RECEIVED
MAR 1 2 2004
FMTA - 1